**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-02034

JONATHAN BLAUFARB, derivatively on behalf of

BIOGEN INC.,

       Plaintiff,

v.

MICHAEL R. MCDONNELL, CHRISTOPHER
A. VIEHBACHER, MICHEL VOUNATSOS,
ALEXANDER J. DENNER, CAROLINE D.
DORSA, MARIA C. FREIRE, WILLIAM A.
HAWKINS, WILLIAM D. JONES, JESUS B.
MANTAS, RICHARD C. MULLIGAN,
STELIOS PAPADOPOULOS, ERIC K.
ROWINSKY, and STEPHEN A. SHERWIN,


       Defendants,

-and-

BIOGEN INC.,

a Delaware Corporation,

       Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Jonathan Blaufarb ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

and on behalf of Biogen Inc. ("Biogen" or the "Company"), files this Verified Shareholder

Derivative Complaint against Individual Defendants Michael R. McDonnell ("McDonnell"),

Christopher A. Viehbacher ("Viehbacher"), Michel Vounatsos ("Vounatsos"), Alexander J.

Denner ("Denner"), Caroline D. Dorsa ("Dorsa"), Maria C. Freire ("Freire"), William A. Hawkins

("Hawkins"), William D. Jones ("Jones"), Jesus B. Mantas ("Mantas"), Richard C. Mulligan

("Mulligan"), Stelios Papadopoulos ("Papadopolos"), Eric K. Rowinsky ("Rowinsky"), and Stephen A. Sherwin ("Sherwin"), (collectively, the "Individual Defendants," and together with Biogen, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Biogen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Viehbacher, Vounatsos, and McDonnell for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Biogen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Biogen's directors and officers from February 3, 2022 and February 13, 2024 (the "Relevant Period").

2.     Biogen is an international biopharmaceutical company that specializes in discovering, developing, and delivering new therapies for people living with chronic, complex diseases all over the world. Biogen's product portfolio includes innovative treatments for a variety of diseases, such as Multiple Sclerosis ("MS") and Friedrich Ataxia. Additionally, Biogen has

"introduced the first approved treatment for SMA, co-developed treatments to address a defining pathology of Alzheimer's disease and launched the first approved treatment to target a genetic cause of ALS."

3.      Biogen operates in several countries throughout the Americas, Europe, and Asia, including, *inter alia*, Argentina, Brazil, Canada, China, Japan, and France.

4.      The Company's products include Leqembi and Aduhelm, two medications used to treat Alzheimer's disease ("AD"), as well as MS-related drugs. In the past, sales of the Company's MS-related products have served as the main revenue generator for Biogen. However, recent fierce competition due to generic versions of Biogen's MS-related products entering the market stunted sales of the Company's MS-related products and consequently caused a significant decline in Biogen products' revenue growth. To compensate for the erosion of the Company's product sales, Biogen has pivoted to developing new drug products to increase revenues.

5.      In the latter half of 2021, several governmental agencies launched investigations into Biogen's communications the United States Food and Drug Administration ("FDA") regarding the FDA's  regulatory approval of Aduhelm in June 2021.

6.      For instance, in July 2021, Acting Commissioner Janet Woodcock asked the Health and Human Services inspector general to investigate communications between the FDA and Biogen during the decision-making process behind the accelerated approval of Aduhelm.[1] The investigation involved "reviewing interactions between the FDA and outside parties as well as

---

[1] Ned Pagliarulo & Jacob Bell, *HHS Watchdog to Review FDA Accelerated Approval Process After Aduhelm Controversy*, BioPharma Dive (Aug. 4, 2021), https://www.biopharmadive.com/news/aduhelm-hhs-inspector-general-review-accelerated-approval/604461/.

other aspects of the [accelerated approval pathway] process, such as deciding on this pathway and scientific disputes," said the inspector general.[2]

7.    Further, the process used to facilitate the review of Aduhelm has also received heightened scrutiny due to the unusual relationship between Biogen and the FDA in the months leading up to the FDA's decision to approve Aduhelm.

8.    Since launching their investigations, multiple other governmental agencies have released investigative reports which disclosed inappropriate communications between Biogen and the FDA that were used to obtain approval of Aduhelm, despite significant concerns about the safety and actual performance of the drug. The United States Federal Trade Commission ("FTC") and the SEC were among the governmental agencies investigating these communications.

9.    In February 2022, the FTC made a civil investigative demand on Biogen that requested documents relating to Aduhelm's marketing and approval.[3] Soon after, the SEC launched an investigation also requesting marketing and approval information regarding the regulatory approval of Aduhelm.

10.    Multiple Congressional Committees have also provided searing reports revealing the improper nature of the communications.

11.    Biogen's highly criticized communications with the FDA were the tip of the iceberg of several other underlying issues. In 2022, the U.S. Department of Justice ("DOJ") announced that Biogen accepted a settlement offer to pay $900 million to resolve allegations that it was responsible for submitting false claims to Medicare and Medicaid by misappropriating funds to physicians to persuade them to prescribe Biogen drugs, specifically MS-related products.

---

[2] *Id.*
[3] https://www.fiercepharma.com/pharma/biogen-s-aduhelm-marketing-approval-under-fire-new-ftc-and-sec-probes

12.     To mitigate the adverse effects caused by these disputes, Biogen supposedly began a campaign to improve corporate governance, transparency, and compliance controls and procedures. In November 2022, Biogen replaced its Chief Executive Officer ("CEO"). It then began releasing compliance, corporate responsibility, and environmental, social, and governance ("ESG") reports showcasing the Company's allegedly improved corporate governance.

13.     Despite these efforts, Aduhelm's disputed regulatory approval has negatively affected the drug's success in the AD treatment market. To counteract this, Biogen launched Leqembi, a product developed in partnership with Eisai Co., Ltd. ("Eisai"), which the FDA approved for AD treatment in 2023. The Company and Eisai aimed to treat 10,000 patients with the Leqembi drug by the end of March 2024.

14.     During the Relevant Period, the Individual Defendants caused the Company to provide non-GAAP diluted earnings-per-share ("EPS") guidance of $15.00 to $16.00 per share for fiscal year 2023 ("2023 Fiscal Year") in February 2023. The Individual Defendants subsequently reaffirmed this guidance over several quarters.

15.     In July 2023, Biogen acquired the pharmaceutical company Reata Pharmaceuticals, Inc. ("Reata") for $172.50 per share in cash, marking Reata's value at approximately $7.3 billion (the "Reata Acquisition"). Through this acquisition, the Company began marketing Skyclarys, the "first and only drug approved in the U.S. and the E.U. for the treatment of Freidrich's Ataxia in adults and adolescents aged 16 years and older." As such, the Reata Acquisition provided the Company with a chance to bolster its product portfolio and counteract the effects of decreasing MS-related treatment sales. Moreover, the Company indicated that "the Reata Acquisition would only be 'slightly' dilutive to Biogen's non-GAAP diluted EPS in 2023."

16.     The truth began to emerge on November 8, 2023, when the Company's third quarter ("Q3") 2023 results were released. They provided negatively revised non-GAAP diluted EPS guidance for FY2023 from $14.50 to $15.00 per share. This guidance was considerably lower than previous guidance for the 2023 Fiscal Year non-GAAP diluted EPS of $15.00 to $16.00 per share, quoting about $0.75 of dilution from the Reata Acquisition.

17.     On this news, the Company's stock price dropped $13.92 per share, or 5.67%, to close at $231.69 per share on November 8, 2023.

18.     On January 8, 2024, J.P. Morgan hosted its 42nd Annual Healthcare Conference (the "J.P. Morgan Conference"). While attending the J.P. Morgan Conference, the Company's CEO, Defendant Viehbacher, mentioned that Biogen was facing issues with Leqembi's launch and that the Company would not be capable of treating 10,000 patients with Leqembi by the end of March 2024.

19.     On this news, the Company's stock price dropped $10.77 per share, or 4.17%, over the next three trading days to close at $247.21 per share on January 11, 2024.

20.     The truth continued to emerge on January 31, 2024, when Biogen revealed that it would discontinue developing and commercializing Aduhelm. Moreover, it announced that the Company has "recorded a one-time charge of approximately $60 million related to close-out costs for the program in the fourth quarter of 2023."

21.     On February 6, 2024, news reports revealed that Eisai was encountering significant issues with Leqembi's launch. Specifically, *Bloomberg* published an article on February 6, 2024, titled "Eisai's New Alzheimer's Drug Is Falling Short of US Target," highlighting the Company's failure to treat 10,000 patients with the Leqembi drug by March 2024. Other news reported similarly—revealing that just 2,000 patients had been treated using Leqembi by the time.

22.     On this news, Biogen's stock price dropped $5.01 per share, or 2.04%, to close at $240.54 per share on February 7, 2024.

23.     Before the market opened on February 13, 2024, the Company issued a press release that reported Biogen's fourth quarter ("Q4") and 2023 Fiscal Year results. The press release reported a Q4 non-GAAP EPS of $2.95, missing consensus estimates by $0.23, and Q4 revenue of $2.4 billion, missing consensus estimates by $60 million and indicating a 5.5% year-over-year ("Y/Y") decline. The press release also revealed the negative effects of previously announced closeout sales for Aduhelm stating that Q4 "GAAP and Non-GAAP diluted EPS [was] negatively impacted by $0.35 related to [the] previously disclosed closeout costs for ADUHELM[.]"

24.     That same day, before the market opened, a conference call was held with investors and analysts to discuss the Company's Q4 and 2023 Fiscal Year results (the "Q4/FY 2023 Earnings Call"). During this conference call, Defendant Viehbacher revealed the slow progress towards the 10,000-patient goal set by Biogen and Eisai for the end of March 2024 stating, "we've got approximately 2,000 patients on [Leqembi] at the moment" and that "we have an indication that there are about 3,800 patients as of last week on the registry."

25.     Following the Q4/FY 2023 Earnings Call, investors and analysts expressed their shock at the disappointing figures disclosed in the Q4/FY 2023 Earnings Call. Soon after, several analysts from major financial firms issued downgrades, while press publications highlighted Biogen's negative financial results.

26.     On this news, the Company's stock price fell $18.09 per share, or 7.39%, to close at $226.65 per share on February 13, 2024.

27.     On February 14, 2024, the Company filed an annual report on Form 10-K with the SEC, for the fiscal quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K

revealed that the DOJ had issued a subpoena against Biogen "seeking information relating to [Biogen's] business operations in several foreign countries" and that "[t]he Company is also providing information relating to [its] business operations in several foreign countries to the SEC."

28.     On this news, Biogen's stock price dropped $5.91 per share, or 2.61% to close at $220.74 per share on February 14, 2024.

29.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

30.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

31.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

32.     In light of the Individual Defendants' misconduct, which has subjected Biogen, its Chief Financial Officer ("CFO"), its current CEO, and its former CEO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CFO, CEO, and former CEO in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Biogen's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

35.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

36.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

37.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

38.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

39.     Plaintiff is a current shareholder of Biogen common stock. Plaintiff has continuously held Biogen common stock since 2020.

### Nominal Defendant Biogen

40.     Biogen is a Delaware corporation with its principal executive offices at 225 Blinney Street, Cambridge, Massachusetts 02142. Biogen's common stock trades on the NYSE under the ticker symbol "BIIB."

**Defendant McDonnell**

41.     Defendant McDonnell has served as the Company's Executive Vice President and CFO since August 2020. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant McDonnell beneficially owned 19,406 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant McDonnell owned approximately $4,053,913 worth of Biogen stock.

42.     For the 2023 Fiscal Year, Defendant McDonnell received $7,167,601 in compensation from the Company. This included $945,268 in salary, $4,960,629 in stock awards, $1,129,183 in non-equity incentive plan compensation, $837 in change in pension value and nonqualified deferred compensation earnings, and $131,684 in all other compensation.  For the fiscal year ended December 31, 2022 ("2022 Fiscal Year,") Defendant McDonnell received $7,209,834 in total compensation from the Company. This included $901,308 in salary, $5,083,295 in stock awards, $1,107,638 in non-equity incentive plan compensation, $2,538 in change in pension value and nonqualified deferred compensation earnings, and $115,055 in all other compensation.

43.     The Company's 2023 10-K annual report stated the following about Defendant McDonnell:

> *Michael R. McDonnell.*
> - Experience:
>     - Mr. McDonnell has served as our Executive Vice President and Chief Financial Officer since August 2020. Prior to joining Biogen, Mr. McDonnell served as Executive Vice President and Chief Financial Officer of IQVIA Holdings Inc., a leading global provider of advanced analytics, technology solutions and contract research services to the life sciences industry, from December 2015 until July 2020. Prior to that, Mr. McDonnell served as the Executive Vice President and Chief Financial Officer of Intelsat, a leading global provider of satellite services, from November 2008 to December 2015, as Executive Vice President and Chief Financial Officer of MCG Capital Corporation, a

publicly-held commercial finance company, from September 2004 until October 2008 and as MCG Capital Corporation's Chief Operating Officer from August 2006 until October 2008. Before joining MCG Capital Corporation, Mr. McDonnell served as Executive Vice President and Chief Financial Officer for EchoStar Communications Corporation (f/k/a DISH Network Corporation), a direct-to-home satellite television operator, from July 2004 until August 2004 and as its Senior Vice President and Chief Financial Officer from August 2000 to July 2004. Mr. McDonnell spent 14 years at PricewaterhouseCoopers LLP, including 4 years as a partner. Mr. McDonnell is a licensed certified public accountant (CPA).

- Public Company Records:
  o Merit Medical Systems, Inc.
- Education:
  o Georgetown University, B.S. Accounting

**Defendant Viehbacher**

44.     Defendant Viehbacher has served as the President and CEO of Biogen, as well as a Company director since November 2022. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Viehbacher beneficially owned 33,840 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Viehbacher owned approximately $7,069,176 worth of Biogen stock.

45.     For the 2023 Fiscal Year, Defendant Viehbacher received $4,069,913 in total compensation from the Company. This included $1,600,000 in salary, $2,376,000 in non-equity incentive plan compensation, $39 in change in pension value and nonqualified deferred compensation earnings, and $93,874 in all other compensation. For the 2022 Fiscal Year, Defendant Viehbacher received $30,488,593 in compensation from the Company. This included $153,846 in salary, $18,800,045 in stock awards, $11,200,610 in option awards, $315,616 in non-equity incentive plan compensation, and $18,476 in all in all other compensation.

46.     The Company's 2024 Proxy Statement stated the following about Defendant Viehbacher:

*Christopher A. Viehbacher*
- <u>Relevant Expertise</u>:
  - o Mr. Viehbacher has extensive international experience in both large pharmaceutical companies and entrepreneurial biotech companies. Mr. Viehbacher brings a keen understanding of the complexities involved in running a multibillion-dollar global pharmaceutical business as well as an appreciation for the value of innovation.
- <u>Career Highlights</u>:
  - o President and CEO, Biogen Inc. (since 2022)
  - o Managing Partner, Gurnet Point Capital, a Boston based investment fund (2015 – 2022)
  - o Global CEO of Sanofi S.A. (2008 – 2014)
  - o Various roles, GlaxoSmithKline (1984 – 2008)
- <u>Other Public Company Boards</u>:
  - o *Prior*:
    - ▪ Pure Tech plc (2015 – 2023)
    - ▪ Axcella Health (2015 – 2019)
  - o <u>Education</u>:
    - ▪ B. Comm. from Queen's University (Kingston, Canada)

**<u>Defendant Vounatsos</u>**

47.     Defendant Vounatsos previously served as CEO and director from January 2017 to November 2022. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Vounatsos beneficially owned 67,262 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Vounatsos owned approximately $20,463,118 worth of Biogen stock.

48.     For the 2022 Fiscal Year, Defendant Vounatsos received $26,625,221 in total compensation from the Company. This included $1,626,039 in salary, $15,389,732 in stock awards, $541,661 in change in pension value and nonqualified deferred compensation earnings, and $9,067,789 in all other compensation.

49.    The Company's 2023 Proxy Statement stated the following about Defendant

Vounatsos:

*Michel Vounatsos*
- Experience:
  - o  Mr. Vounatsos has served as our Chief Executive Officer and one of our directors since January 2017. Prior to that, from April 2016 to December 2016, Mr. Vounatsos served as our Executive Vice President, Chief Commercial Officer. Prior to joining Biogen, Mr. Vounatsos spent 20 years at Merck & Co., Inc., a pharmaceutical company, where he most recently served as President, Primary Care, Customer Business Line and Merck Customer Centricity. In this role, he led Merck's global primary care business unit, a role which encompassed Merck's cardiology-metabolic, general medicine, women's health and biosimilars groups and developed and instituted a strategic framework for enhancing the company's relationships with key constituents, including the most significant providers, payers and retailers and the world's largest governments. Mr. Vounatsos previously held leadership positions across Europe and in China for Merck. Prior to that, Mr. Vounatsos held management positions at Ciba-Geigy, a pharmaceutical company. Mr. Vounatsos currently serves as a director of PerkinElmer, Inc., a global scientific technology and life science research company, on the advisory board of Tsinghua University School of Pharmaceutical Sciences, on the Supervisory Board of Liryc, the Electrophysiology and Heart Modeling Institute at the University of Bordeaux, as a member of the MIT Presidential CEO Advisory Board and as a member of NetZero International Leadership Counsel. Mr. Vounatsos received his C.S.C.T. certificate in Medicine from the Universite Victor Segalen, Bordeaux II, France, and his M.B.A. from the HEC School of Management in Paris.
- Qualifications:
  - o  Mr. Vounatsos has significant knowledge and experience with respect to the biotechnology, healthcare and pharmaceutical industries, a comprehensive global leadership background resulting from service as an executive in the pharmaceutical industry and studied medicine and business as part of his educational background.
- Other Current Public Company Boards:
  - o  PerkinElmer, Inc
- Education:
  - o  None

**Defendant Denner**

50.    Defendant Denner is a former director who served on the Company's board from

2009 to June 2023. He also previously served as the Chair of the Corporate Governance

Committee. According to the Company's Schedule 14A filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of April 28, 2023 Defendant Denner beneficially owned 658,099 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Denner owned approximately $200,213,459 worth of Biogen stock.

51.    For the 2023 Fiscal Year, Defendant Denner received $77,500 in compensation from the Company, consisting entirely of $77,500 in stock awards. For the 2022 Fiscal Year, Defendant Denner received $425,246 in compensation from the Company. This included $155,000 in fees earned or paid in cash and $270,246 in stock awards.

52.    The Company's 2023 Proxy Statement stated the following about Defendant Denner:

*Alexander J. Denner.*
- Experience:
  - Dr. Denner is a founding partner and Chief Investment Officer of Sarissa Capital Management LP, a registered investment advisor, which he founded in 2012. Sarissa Capital focuses on improving the strategies of companies to enhance stockholder value. From 2006 to 2011, Dr. Denner served as a Senior Managing Director at Icahn Capital L.P. Prior to that, he served as a portfolio manager at Viking Global Investors, a private investment fund, and Morgan Stanley Investment Management, a global asset management firm.
- Qualifications:
  - Dr. Denner has significant experience overseeing the operations and research and development functions of healthcare companies and evaluating corporate governance matters. He also has extensive experience as an investor, particularly with respect to healthcare companies, and possesses broad healthcare industry knowledge.
- Other Current Public Company Records:
  - Ironwood Pharmaceuticals, Inc.
- Former Public Company Directorships Held in the Past Five Years:
  - Ariad Pharmaceuticals, Inc. (Chair), Bioverativ Inc. Sarissa Capital Acquisition Corp. (Chair), The Medicines Company (Chair)

**Defendant Dorsa**

53.     Defendant Dorsa has served as a Company director since January 2010. She also currently serves as the Chair of Biogen's Corporate Governance Committee and previously served as the Chair of the Audit Committee up until the 2023 Annual Meeting. According to the Company's Schedule 14A filed with the SEC on April 26, 2024 (the "2024 Proxy Statement") as of April 26, 2024 Defendant Dorsa beneficially owned 24,882 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Dorsa owned approximately $5,197,850 worth of Biogen stock.

54.     For the 2023 Fiscal Year, Defendant Dorsa received $646,132 in compensation from the Company. This included $201,236 in fees earned or paid in cash and $444,896 in other compensation. For the 2022 Fiscal Year, Defendant Dorsa received $425,246 in compensation from the Company. This included $ 155,000 in fees earned or paid in cash and $270,246 in stock awards.

55.     The Company's 2024 Proxy Statement stated the following about Defendant Dorsa:

*Caroline D. Dorsa.*
- Relevant Experience:
  - Ms. Dorsa has deep knowledge of the pharmaceutical industry as well as significant financial and accounting expertise. Her strategic perspective on the industry enhances the Board's oversight of the company's growth initiatives and reviews of both internal development projects and external opportunities.
- Career Highlights:
  - Executive Vice President (EVP) and Chief Financial Officer (CFO), Public Service Enterprise Group, Inc. (2009 – 2015)
  - Senior Vice President (SVP) of Global Human Health, Strategy and Integration, Merck & Co., Inc. (2008 – 2009)
  - Various financial and operational positions at Merck & Co., Inc. (2007 – 2008)
- Other Public Company Records
  - *Current*:

- ▪ Illumina, Inc. (since 2010)
- ▪ Duke Energy Corporation (since 2021)
  - o *Prior*:
    - ▪ Intellia Therapeutics, Inc. (2015 – 2023)
    - ▪ Goldman Sachs Funds (2016 –2021)
    - ▪ Public Service Enterprise Group, Inc. (2003 – 2009)
- • Education:
  - o B.A. in History from Colgate University
  - o M.B.A. in Finance and Accounting from Columbia University

## **Defendant Freire**

56.     Defendant Freire has served as a Company director since June 2021. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Freire beneficially owned 3,105 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Freire owned approximately $648,635 worth of Biogen stock.

57.     For the 2023 Fiscal Year, Defendant Freire received $412,899 in compensation from the Company. This included $140,000 in fees earned or paid in cash, $270,317 in stock awards and $2,582 in all other compensation. For the 2022 Fiscal Year, Freire received $413,789 in compensation from the Company. This included $140,000 in fees earned or paid in cash, $270,246 in stock awards, and $3,543 in all other compensation.

58.     The Company's 2024 Proxy Statement stated the following about Defendant Freire:

*Maria C. Freire.*
- • Experience:
  - o From November 2012 to September 2021, Dr. Freire served as President and Executive Director and as a member of the Board of Directors of the Foundation for the National Institutes of Health. From March 2008 to November 2012, she served as President and as a member of the Board of Directors of the Albert and Mary Lasker Foundation. Prior to joining the Lasker Foundation, Dr. Freire served as President and Chief Executive Officer of the Global Alliance for TB Drug Development from 2001 to 2008 and Director of the Office of Technology Transfer at the National Institutes of Health from 1995 to 2001. She has served on the boards of numerous national and international organizations,

17

including the Science Board of the U.S. Food and Drug Administration, the World Health Organization Commission on Intellectual Property Rights, Innovation and Public Health and the United Nations Secretary General's High Level Panel on Access to Medicines. Dr. Freire also serves on the Board of Koneksa Health, a private company that develops, tests and validates digital biomarkers for clinical trials. Dr. Freire is also a member of the National Academy of Medicine and the Council on Foreign Relations, and she is the recipient of numerous awards, including a 2017 Gold Stevie Award for "Woman of the Year," the U.S. Department of Health and Human Services Secretary's Award for Distinguished Service, the Arthur S. Fleming Award and the Bayh-Dole Award. Dr. Freire holds a Ph.D. in Biophysics from the University of Virginia and a B.S. from the Universidad Peruana Cayetano Heredia in Lima, Peru.

- Qualifications:
  - o Dr. Freire has significant knowledge and experience with respect to medical research, the pharmaceutical industry and government healthcare policymaking. Dr. Freire's strong public policy and government experience also provides vital insights to our Board of Directors about significant issues affecting the highly regulated life sciences industry.
- Other Current Public Company Boards:
  - o Alexandria Real Estate Equities, Inc. (since 2012)
  - o Exelixis, Inc. (since 2018)
- Former Public Company Directorships Held in the Past Five Years:
  - o None

**Defendant Hawkins**

59.    Defendant Hawkins has served as a Company director since June 2019. He is also the Chair of the Audit Committee and a member of the Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Hawkins beneficially owned 5,150 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Hawkins owned approximately $1,075,835 worth of Biogen stock.

60.    For the 2023 Fiscal Year, Defendant Hawkins received $425,729 in compensation from the Company. This included $155,142 in fees earned or paid in cash and $270,317 in stock awards.

61.    The Company's 2024 Proxy Statement stated the following about Defendant Hawkins:

*William A. Hawkins*.

- Relevant Expertise:
  - o Mr. Hawkins has significant executive and board leadership experience in the healthcare industry both domestic and international. Mr. Hawkins' unique perspective enhances the Board's oversight of the company's global strategic plans and implementation.
- Career Highlights:
  - o Senior Advisor to EW Healthcare Partners, a life science private equity firm (since 2017)
  - o President and CEO, Immucor, a global leader in transfusion and transplant medicine (2011 – 2015)
  - o Chairman and CEO, Medtronic, Inc. (2002 – 2011)
  - o President and CEO, Novoste Corporation, an interventional cardiology company (1998 – 2001)
- Other Public Company Boards
  - o *Current*:
    - ▪ Chair, Bioventus, Inc. (since 2016)
    - ▪ MiMedx Group, Inc. (since 2020)
  - o *Prior*:
    - ▪ Avanos Medical, Inc. (2015 – 2021)
    - ▪ Thoratec Corporation (2011 – 2015)
- Other Boards & Awards:
  - o Director, Virtue Labs, Enterra, Lacuna Medical, Cirtec Medical Corp. And Barbies, Inc., all private life companies
  - o Duke University Health System
  - o Member, National Academy of Engineering, and AIMBE College of Fellows
- Education:
  - o B.Sc. in Electrical and Biomedical Engineering (dual) from Duke University
  - o M.B.A. from the University of Virginia's Darden School of Business

**Defendant Jones**

62.    Defendant Jones served as a Company director from June 2021 to June 2023. He also served as Chair of the Compensation and Management Development Committee.

63.    For the 2023 Fiscal Year, Defendant Jones received $77,500 in compensation from the Company, consisting solely of $77,500 fees earned or cash paid. For the 2022 Fiscal Year,

Defendant Jones received $437,746 in compensation from the Company. This included $147,500 in fees earned or paid in cash, $270,246 in stock awards, and $20,000 in other compensation.

64.    The Company's 2023 Proxy Statement stated the following about Defendant Jones:

*William D. Jones*.
- Experience:
    - William Jones is the Managing Member of CityLink LLC, an investment and consulting firm. He is the former President/CEO of CityLink Investment Corporation, a commercial real estate company he formed in 1994 that earned national acclaim for developing complex private and public urban projects. He served as President/CEO of City Scene Management Company from 2001 through 2018. Prior to that, Mr. Jones served as Investment Manager of certain Prudential real estate subsidiaries and as General Manager/Senior Asset Manager overseeing more than 2 million square feet of office, retail, industrial and multi-family properties in three states. Earlier in his career, he served in San Diego city government as a City Council Member, Deputy Mayor and Chief of Staff to City Council Member Leon Williams. Mr. Jones is an independent director and board chair of certain funds managed by the Capital Group with net assets of approximately $600 billion and former chairman of the Audit and Nominating/Governance committees. Mr. Jones is an independent director of Global Infrastructure Solutions Inc., a private global engineering and construction services company and chairs its Compensation and Organization Committee and is its Lead Valuation Director. He is a trustee of the UC San Diego Foundation Board and a member of its Investment Committee and Real Estate Advisory Council. Mr. Jones is a National Association Corporate Director Board Leadership Fellow and is listed in the 2019 NACD Directorship 100. He was honored as one of the nation's "Most Influential Black Corporate Directors" by Savoy Magazine in 2021.
- Qualifications:
    - Mr. Jones has extensive leadership experience in business, not-for profit boards and government, and provides vital insights to our Board of Directors about governance and significant issues affecting the highly regulated life sciences industry. He brings financial, corporate governance and public policy sector expertise to our Board of Directors.
- Other Current Public Company Records:
    - None
- Former Public Company Directorships Held in the Past Five Years:
    - Sempra Energy

**Defendant Mantas**

65.     Defendant Mantas has served as a Company director since June 2019. He also serves as the Chair of the Compensation and Management Development Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Mantas beneficially owned 6,048 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Stat owned approximately $1,263,427 worth of Biogen stock.

66.     For the 2023 Fiscal Year, Defendant Mantas received $433,229 in compensation from the Company. This included $162,912 in fees earned or cash paid and $270,317 in stock awards. For the 2022 Fiscal Year, Defendant Mantas received $417,746 in total compensation from the Company. This included $147,500 in fees earned or cash paid and $270,246 in stock awards.

67.     The Company's 2024 Proxy Statement stated the following about Defendant Mantas:

*Jesus B. Mantas.*
- Relevant Expertise:
  - o Mr. Mantas has over 30 years of experience in global business operations, information technology, data science and artificial intelligence gained through global strategy and operating management roles across Europe, North America and Latin America. His expertise enhances Board perspectives on global operating scale, business strategy, culture change, managing risks, applying technology to improve business performance, seeking diversity and developing talent and succession plans in multi-cultural environments.
- Career Highlights:
  - o Global Managing Partner, IBM Global Business Services (since 2022)
  - o Senior roles at IBM (2002 – 2022) including:
    - ▪ Global Managing Partner, Strategy, Innovation and Corporate Development
    - ▪ Global Managing Partner, IBM Business Consulting
    - ▪ General Manager, IBM Business Process Outsourcing
    - ▪ Managing Partner and General Manager, IBM Global Business Services Latin America
  - o Senior Partner, IBM Global Business Services

- o Partner, High Technology Practice, PricewaterhouseCoopers Consulting (1997 – 2002)
- o Adjunct Professor, University of California Irvine, Graduate School of Management, Paul Merage School of Business (1997 – 2001)
- o Second Lieutenant, Air Force of Spain (1993)
- Other Public Company Records
  - o None
- Education
  - o B.S. in Telecommunications – Software Engineering, Universidad Politécnica de Madrid (Madrid, Spain)
  - o Degree in Business Administration, Universidad Politécnica de Madrid (Madrid, Spain)
  - o  Corporate Governance – Harvard Business School

**Defendant Mulligan**

68.    Defendant Mulligan served as a Company director from June 2009 to June 2023. He also served on the Compensation and Management Development Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Mulligan beneficially owned 15,099 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Mulligan owned approximately $4,593,568 worth of Biogen stock.

69.    For the 2023 Fiscal Year, Defendant Mulligan received $70,000 in compensation from the Company, consisting solely of $70,000 in fees earned or paid in cash. For the 2022 Fiscal Year, Defendant Mulligan received $410,246 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $270,246 in stock awards.

70.    The Company's 2023 Proxy Statement stated the following about Defendant Mulligan:

*Richard C. Mulligan.*
- Expertise:
  - o Dr. Mulligan is currently the Mallinckrodt Professor of Genetics, Emeritus, at Harvard Medical School, after serving as the Mallinckrodt Professor of Genetics and Director of the Harvard Gene Therapy Initiative from 1996 to 2013. He also currently serves as the Head of

SanaX, a division of the research department of Sana Biotechnology, Inc. (Sana), a biotechnology company. From March 2017 to October 2018, Dr. Mulligan served as a Portfolio Manager at Icahn Capital LP. Prior to that, Dr. Mulligan was a founding partner of Sarissa Capital Management LP, a registered investment advisor, from 2013 to 2016. Prior to Harvard, Dr. Mulligan was a Professor of Molecular Biology at the Massachusetts Institute of Technology, a member of the Whitehead Institute for Biomedical Research and the Chief Scientific Officer of Somatix Therapy Corporation, a drug discovery and development company that he founded. Dr. Mulligan was named a MacArthur Foundation Fellow in 1981.

- Qualifications:
  - Dr. Mulligan has scientific expertise in the areas of molecular biology, genetics, gene therapy and biotechnology as well as extensive experience within the healthcare industry, including overseeing the operations and research and development of healthcare companies.
- Other Current Public Company Records
  - Sana Biotechnology, Inc. (Vice Chairman)
  - Bausch Health Companies
- Former Public Company Directorships Held in the Past Five Years
  - None

**Defendant Papadopoulos**

71.     Defendant Papadopoulos served as a Company director from July 2008 to June 2023. He was also a member of the Audit Committee and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Papadopoulos beneficially owned 38,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Papadopoulos owned approximately $11,652,313 worth of Biogen stock.

72.     For the 2023 Fiscal Year, Defendant Papadopoulos received $140,000 in total compensation from the Company. This included $115,000 in fees earned or cash paid and $25,000 in other compensation. For the 2022 Fiscal Year, Defendant Papadopoulos received $667,321 in compensation from the Company. This included $222,500 in fees earned or cash paid and $444,821 in stock awards.

73.     The Company's 2023 Proxy Statement stated the following about Defendant Papadopoulos:

*Stelios Papadopoulos, Ph.D.*
- Experience:
  - o  Dr. Papadopoulos serves as the Chairman of Exelixis, Inc., a drug discovery and development company that he co-founded in 1994, Regulus Therapeutics Inc., a biopharmaceutical company, and Eucrates Biomedical Acquisition Corp., a special purpose acquisition company. Previously, he was an investment banker with Cowen & Co., LLC, a financial services company, focusing on the biotechnology and pharmaceutical sectors, from 2000 until his retirement as Vice Chairman in August 2006. Prior to joining Cowen & Co., Dr. Papadopoulos served for 13 years as an investment banker at PaineWebber, Inc., a financial services company, where he was most recently Chairman of PaineWebber Development Corp., a PaineWebber subsidiary focusing on biotechnology.
- Qualifications:
  - o  Having founded multiple life sciences companies and worked as an investment banker focused on the life sciences industry, Dr. Papadopoulos brings to our Board of Directors a first-hand understanding of the demands of establishing, growing and running life sciences businesses.
- Other Current Public Company Records
  - o  Eucrates Biomedical Acquisition Corp. (Chair)
  - o  Exelixis, Inc. (Chair)
  - o  Regulus Therapeutics Inc. (Chair)
- Former Public Company Directorships Held in the Past Five Years
  - o  BG Medicine, Inc.

**Defendant Rowinsky**

74.     Defendant Rowinsky has served as a Company director since March 2010. He is also a member of the Compensation and Management Development Committee and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Rowinsky beneficially owned 20,629 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Rowinsky owned approximately $4,309,398 worth of Biogen stock.

75.    For the 2023 Fiscal Year, Defendant Rowinsky received $418,023 in total compensation from the Company. This included $147,706 in fees earned or cash paid and $270,317 in stock awards. For the 2022 Fiscal Year, Defendant Rowinsky received $410,246 in compensation from the Company. This included $140,000 in fees earned or cash paid and $270,246 in stock awards.

76.    The Company's 2024 Proxy Statement stated the following about Defendant Rowinsky:

*Eric K. Rowinsky, M.D.*
- Relevant Expertise:
  - Dr. Rowinsky has extensive research and drug development and regulatory experience and broad scientific and medical knowledge. His experience leading teams that have registered more than twelve novel therapies for patients with advanced cancers enhances the Board's oversight of the company's research and development (R&D) and quest to pioneer breakthrough innovations within the highly regulated life sciences industry.
- Career Highlights:
  - President, Inspirna, a privately held life science company (since 2015), and Executive Chairman (2016 – 2021)
  - Chief Medical Officer, Hummingbird Biotherapeutics (2020 – 2023)
  - Chief Scientific Officer, Clearpath Development, Inc. (2016 – 2021)
  - Head of R&D, Chief Medical Officer, Stemline Therapeutics (2012 – 2015)
  - CEO, Primrose Therapeutics, Inc., a biotech start-up (2010 – 2011)
  - Chief Medical Officer, and Executive Vice President, ImClone Systems (2005-2010)
- Other Public Company Boards
  - *Current:*
    - Fortress Biotech Inc. (2010 to June 2024) (not standing for reelection at the annual meeting in May 2024)
    - Purple Biotech Ltd. (since 2019)
    - Verastem, Inc. (since 2017)
  - *Prior*:
    - BIND Therapeutics, Inc. (2014 – 2016)
- Former Public Company Directorships Held in the Past Five Years
  - BG Medicine, Inc.

**Defendant Sherwin**

77.     Defendant Sherwin has served as a Company director since March 2010. He also
serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April
26, 2024 Defendant Sherwin beneficially owned 18,738 shares of the Company's common stock.
Given that the price per share of the Company's common stock at the close of trading on April 26,
2024 was $208.90, Defendant Sherwin owned approximately $3,914,368 worth of Biogen stock.

78.     For the 2023 Fiscal Year, Defendant Sherwin received $435,317 in total
compensation from the Company. This included $140,000 in fees earned or cash paid, $270,317
in stock awards, and $25,000 in all other compensation. For the 2022 Fiscal Year, Defendant
Sherwin received $435,246 in compensation from the Company. This included $140,000 in fees
earned or cash paid, $270,246 in stock awards, and $25,000 in all other compensation.

79.     The Company's 2024 Proxy Statement stated the following about Defendant
Sherwin:

*Stephen A. Sherwin, M.D.*
- Relevant Expertise:
  - o   Dr. Sherwin has extensive knowledge of the life sciences industry
    through his advisory work in life sciences, and patient care and teaching
    in his specialty of medical oncology, as well as founding and leading
    life sciences companies. Dr. Sherwin's more than 30 years of industry
    experience significantly enhances Board oversight and development of
    the company's strategy and execution.
- Career Highlights:
  - o   Clinical Professor of Medicine at the University of California, San
    Francisco (since 2010)
  - o   Volunteer Attending Physician in Hematology-Oncology at the
    Zuckerberg San Francisco General Hospital (since 2010)
  - o   Advisory partner, Third Rock Ventures, LLC (since 2016)
  - o    Chairman and Co-founder, Ceregene, a life sciences company acquired
    by Sangamo Biosciences (2001 – 2013)
  - o   Chairman  and Co-founder, Abgenix, Inc, an antibody company
    acquired by Amgen (1996 – 2006)
  - o   CEO, Cell Genesys, Inc., a life sciences company merged with BioSante
    Pharmaceuticals, Inc. (now ANI Pharmaceuticals, Inc.) (1994 – 2009)
- Other Public Company Boards:
  - o   *Current:*

26

- Neurocrine Biosciences Inc. (since 1999)
  - *Prior*:
    - Epiphany Technology Acquisition Corp. (2022 to 2023)
    - Bios Special Acquisition Corporation (2021 to 2023)
    - Aduro Biotech, Inc (2015 – 2020)
  - <u>Education</u>:
    - B.A., in Biology from Yale University
    - M.D. from Harvard Medical School

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

80.     By reason of their positions as officers, directors, and/or fiduciaries of Biogen and because of their ability to control the business and corporate affairs of Biogen, the Individual Defendants owed Biogen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Biogen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Biogen and its shareholders so as to benefit all shareholders equally.

81.     Each director and officer of the Company owes to Biogen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Biogen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.     To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Biogen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Biogen's Board at all relevant times.

85.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.    To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Biogen were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Biogen's own Code of Business Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Biogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Biogen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Biogen's operations would comply with all applicable laws and Biogen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.     Each of the Individual Defendants further owed to Biogen and the shareholders the duty of loyalty requiring that each favor Biogen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Biogen and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, and directorial positions with Biogen, each of the Individual Defendants had access to adverse, non-public information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Biogen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement waste of corporate assets, abuse of control, and violations of Section 14(a), 10(b) and 21D of the Exchange Act.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Biogen, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Biogen and was at all times acting within the course and scope of such agency.

## BIOGEN'S CODE OF BUSINESS CONDUCT

### *Code of Business Conduct*

96.     The Company's Code of Business Conduct begins by stating that it "applies to all [Biogen] employees, officers, and directors."

31

97.     The Code of Business Conduct states that "At Biogen, we understand and accept our responsibilities to respect and care for our patients, fellow employees and customers, to always act in accordance with our Ethical Principles and to comply with all applicable laws and regulations."

98.     In a section titled "**We are fair and honest**," the Code of Business Conduct provides:

> We operate fairly and honestly with all of our stakeholders and business partners and expect that they will do the same. Our books, records and financial statements must be honest, accurate, objective, complete and timely in order to ensure we make sound business decisions.
>
> We Communicate Transparently
> We are transparent and communicate truthful information in a manner that is not misleading. Our promotional, medical and investor information is appropriately vetted and approved prior to use.
>
> Maintaining Strong Business Partnerships
> We treat all our business partners fairly and honestly, and we expect them to act with integrity. In dealing with Biogen, suppliers and business partners must follow the Code.

99.     In a section titled "**Complete, accurate and timely disclosures and business records**," the Code of Business Conduct provides:

> Our Company is subject to extensive and complex reporting requirements. Our operations must comply with all applicable regulatory, accounting, financial, tax and other rules and regulations of the jurisdictions in which we operate.
>
> Business partners, government officials, investors and the public rely on the accuracy and completeness of our financial reports, business records and what we tell them. All of our financial records and accounts, and financial statements must be clear and complete, maintained in reasonable detail, and appropriately reflect our Company's transactions and activities. This includes our financial records and operational data such as cost and production data, expense reports and employee records. Accurate and complete information is also essential to us as a basis for sound decision-making.
>
> The Company's filings with the Securities and Exchange Commission, as well as other public disclosures by or on behalf of our Company, must be fair, complete, accurate, timely, and understandable. Our accounting and financial reporting practices must also comply with applicable generally accepted accounting

principles and other criteria, such as local statutory reporting and tax requirements.
Depending on their positions with the Company, employees may be called upon to
provide necessary information to assure that the Company's filings and public
communications meet these standards. The Company expects employees to take
this responsibility seriously and to promptly provide current, accurate and complete
answers to inquiries related to the Company's public disclosure requirements.

100.    In a section titled "**Managing Our Records**," the Code of Business Conduct

provides:

Each of us is responsible for information and records under our control so we need to be
familiar with the records management procedures that apply to our jobs.

Biogen has a records and information management policy and procedures to ensure that
our financial records and information are appropriately maintained, stored, secured and
destroyed in accordance with our business needs and in compliance with applicable laws
and regulations.

We maintain paper and electronic records for as long as required by our policies and law
and our records are organized so that they can be located and retrieved when needed.
Documents should only be destroyed in accordance with our Global Records Retention and
Disposition Policy, and never in response to or in anticipation of litigation, an investigation
or an audit.

101.    The Code of Business Conduct states, in a section titled "**Insider Trading,**" that:

We [Biogen] will not use Biogen information or information from our business
partners for personal benefit.

Our Global Insider Trading and Information Policy prohibits all of our directors,
officers, employees, and temporary staff worldwide, as well as their immediate
family members, from trading securities, or disclosing or passing along information
to others who then trade (i.e. "tipping"), on the basis of material non-public
information. You may only purchase or sell a company's securities if you are not
in possession of material non-public information about the company. Additionally,
certain individuals are subject to additional trading restrictions, which limit those
individuals to trading in the Company's securities only during certain open trading
windows or under a 10b5-1 trading plan.

Material information is information that a reasonable investor would consider
important in deciding whether to buy or hold a security. Examples that may be
considered material:
    o   A pending or proposed acquisition, sale or other significant transaction
    o   Results of late-stage clinical trials

    o  A significant product development or important information about a product, such as serious product safety issues
    o  Receipt of regulatory approval or failure to obtain regulatory approval for products
    o  Significant litigation or patent-related events
    o  Earnings or financial performance

Information is considered non-public if it has not been previously disclosed to the public through press releases or SEC filings and is otherwise not available to the general public. Information is generally considered "public" after it has been publicly available for at least 24 hours after disclosure.

Violations of the insider trading laws are severe and include civil and criminal fines and penalties. It is your responsibility to ensure that you do not violate the insider trading laws or our Global Insider Trading and Information Policy.

102.    The Code of Business Conduct states, in a section titled "**Compliance with laws, regulations, and standards**" that:

We live and work in a global environment and fact a number of laws and regulations governing our industry's operations. These laws and regulations have a direct impact on our daily work. They also govern our interactions with our many business partners and associates such as researchers, patients, healthcare professionals and governments.

We understand that these laws and regulations are there to help protect our employees and the patients, customers, and investors we serve. For that simple reason, we are committed to upholding the letter and spirit of these laws and regulations wherever we do business, succinctly summarized as follows:

- Everywhere we operate; we must be aware of and comply with laws and regulations that govern our business activities
- Since we operate in many different countries and jurisdictions, there may seem to be a conflict between applicable laws. When you encounter such a conflict, consult with the Legal Department.

103.    The Code of Business Conduct states, in a section titled "**We are transparent and ethical**" that:

We do not offer or provide improper incentives, kickbacks, or bribes to win business, to influence a business or prescribing decision, or to advance our interests with government authorities. In particular, our interactions with healthcare professionals, government entities, government employees, and others must be legitimate and never to obtain and improper advantage or to improperly influence or encourage a decision by them.

34

<u>Cooperating with Regulators</u>

We will always comply with relevant laws and regulations and cooperate with government agencies, law enforcement officials and investigators. If you receive any inquiries from government regulators or officials, you should contact the Legal department immediately and wait for their guidance before responding to any such request. When notified of an external investigation, we will take prompt action to preserve documents that may be relevant and respond to requests for information in an honest and timely manner.

We will promptly review all reports of misconduct and undertake investigations to gather additional information. All employees are expected to cooperate fully and truthfully with investigators. Never mislead an investigator and never alter or destroy any records in response to an investigation. Other important points you should know about the investigations process include:

- o The facts of the case will typically be developed through interviews and document review.
- o Depending on the nature of the investigation and the matters at issue, you may be instructed by the investigators or the Legal department not to discuss any aspect of the investigation.
- o If misconduct is discovered, the Company will take whatever corrective or disciplinary action is necessary to address the situation and prevent a recurrence.

104.    The Individual Defendants violated the Code of Business Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. In further violation of the Code of Business Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## <u>BIOGEN'S AUDIT COMMITTEE CHARTER</u>

***Audit Committee Charter***

105.    The Charter of the Audit Committee of the Board of Directors of Biogen (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

106.    Per the Audit Committee Charter, the Audit Committee's "purpose" is to "assist the Board of Directors in its oversight of:

- the integrity of the Company's financial statements;
- the accounting and financial reporting processes of the Company;
- the independence, qualifications and performance of the Company's independent registered public accounting firm;
- the effectiveness of the Company's internal control over financial reporting;
- the Company's tax strategy and internal audit and corporate compliance functions;
- the Company's financial strategy, policies and practices;
- management's exercise of its responsibility to assess and manage risks associated with the Company's financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor matters; and
- the adequacy and effectiveness of the Company's insurance programs

The Audit Committee Charter lists the Audit Committee's responsibilities, a few of which are:

107.    <u>Financial Statements and Disclosures</u>

- Discuss with management and the independent registered public accounting firm the annual audited financial statements and quarterly financial statements prior to filing, including related disclosures and matters required to be reviewed by the Committee under applicable legal, regulatory or Nasdaq requirements, and such other reports required to be provided by the independent registered public accounting firm under applicable accounting and auditing standards.

- Discuss with management and the independent registered public accounting firm, as appropriate, earnings results, and significant financial disclosure issues, including any related GAAP and nonGAAP annual and quarterly financial information that is included in earnings press releases, including pro forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein and/or that is regularly provided to analysts and ratings agencies.

- At least on an annual basis, review with management and the independent registered public accounting firm the Company's financial reporting and accounting policies and principles significant changes in such policies or principles or in their application and the key accounting

decisions affecting the Company's financial statements, including alternatives to, and the rationale for, the decisions made.

- Review with management and the independent registered public accounting firm the effect of regulatory and accounting trends, developments and initiatives on the Company's financial statements.

- Review and investigate, as appropriate, matters pertaining to the integrity of the Company's financial statements.

- Establish procedures for confidential and anonymous submission and treatment of complaints regarding the Company's accounting, internal controls, disclosure or other financial or auditing matters.

- Prepare and publish an annual Committee report in the Company's proxy statement in accordance with applicable SEC rules and regulations

\* \* \*

108.  <u>Internal Controls</u>

- At least on an annual basis, review with management and the independent registered public accounting firm the adequacy and effectiveness of the Company's system of internal financial and accounting controls and the Company's disclosure controls, procedures and procedures, including their effectiveness.

- Review with management the Company's assessment of its significant financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor risk exposures and steps taken by management to monitor and mitigate such exposures

\* \* \*

(a)  <u>Corporate Compliance.</u> The Committee shall:

- Oversee the Company's ABAC, patient, healthcare provider and third party payor compliance program ("Corporate Compliance Program") and Chief Compliance Officer ("CCO").

- Approve the hiring, evaluation, compensation, and dismissal of the Chief Compliance Officer.

- Make appropriate inquiries of management and the CCO as to the budget of Corporate Compliance Program and approve the annual Corporate Compliance Program goals.

- Receive regular updates from the CCO regarding the effectiveness of the Corporate Compliance program, progress against goals and monitoring results.

109. <u>Other Matters.</u>

- Management is responsible for preparing the Company's financial statements and the independent registered public accounting firm is responsible for auditing those financial statements. The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent registered public accounting firm, which reports directly to the Committee. In carrying out its oversight responsibilities, the Committee is not providing any expert or special assurances as to the Company's financial statements or any professional certifications as to the work of the independent registered public accounting firm.

110. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

<b><u>BIOGEN'S CORPORATE GOVERNANCE PRINCIPLES</u></b>

111. In a section titled "**Ethics**" the Company's Corporate Governance Principles state the following:

The Board expects Biogen directors, as well as officers and employees, to act ethically at all times and to acknowledge their adherence to the policies comprising Biogen's Code of Business Conduct. Any waivers of the Code of Business Conduct or other ethics policy for directors or executive officers must be approved by the Board. All waivers will be promptly disclosed as required by law or stock exchange regulation.

112.    In violation of the Company's Corporate Governance Principles, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Company's Corporate Governance Principles, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Business Conduct. The Individual Defendants further failed to obtain waivers before violating the Code of Business Conduct and/or failed to disclose waivers permitting them to violate the Code of Business Conduct if they had actually obtained them.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

113.    As a global biopharmaceutical company that develops therapies for those living with grave illnesses, Biogen has a broad portfolio of drug products. The portfolio includes, *inter alia*, Leqembi and Aduhelm used to treat AD and various other medicines.

114.    MS-related products have historically been the main driver of the Company's product revenues. However, the introduction of various new generics into the MS-related drugs market has significantly increased competition, causing a substantial decline in Biogen's product sales and revenues. To offset declining MS-related product sales, Biogen has shifted its focus to developing innovative products, including treatments for AD.

115.    In 2021, the approval of Biogen's Alzheimer's treatment, Aduhelm, was shrouded in controversy after investigations exposed prior communications between Biogen and representatives of the FDA regarding the regulatory approval of Aduhelm which potentially neglected safety and performance concerns.

116.    Specifically, the FTC, SEC, several Congressional Committees, and the Office of the Inspector General of U.S. Department of Health and Human Services began investigating the communications and conduct between the Company and the FDA relating to the regulatory approval of Aduhelm.

117.    A short year later, the DOJ publicized Biogen's $900 million dollar settlement to resolve allegations that it was responsible for the submission of false claims to Medicare and Medicaid made by paying kickbacks to physicians to incentivize them to prescribe Biogen's MS-related drugs. Former employee of Biogen, Michael Bawduniak, sued the Company in 2012 under the False Claims Act's whistle-blower provisions, which allow private individuals to sue on the government's behalf.[4] In the lawsuit, Bawduniak alleged that Biogen would "pay healthcare professionals who spoke at or attended Biogen's speaker training programs, speaker training meetings, and consultant programs" to "induce these doctors to prescribe the company's products."[5] Mr. Bawduniak specifically stated, in the lawsuit, that "these tactics paid off in soaring [product] sales."[6] Although Biogen maintained that it did not commit any wrongdoing, the

---

[4] Press Release, Office of Public Affairs: U.S. Department of Justice, Biogen Inc. Agrees to Pay $900 Million to Settle Allegations Related to Improper Physician Payments (Sept. 26, 2022), https://www.justice.gov/opa/pr/biogen-inc-agrees-pay-900-million-settle-allegations-related-improper-physician-payments.
[5] Id.
[6] Stacy Cowley, Biogen Agrees to Pay $900 Million to Settle Lawsuit Over Kickbacks, N.Y. Times, Sept. 26, 2022, at A1.

Company ultimately agreed to the $900 million settlement to "allow the company to remain focused on our patients and strategic priorities."[7]

118.    After these controversies, the Company began a campaign to improve its transparency, corporate governance, and compliance controls and procedures. The campaign involved Biogen replacing its CEO in November 2022 and since releasing compliance, corporate responsibility, and ESG reports representing enhancements in the Company's compliance and governance practices.

119.    On May 2, 2024, *Yahoo! Finance* published an article titled "Biogen Reports Progress on Corporate Responsibility Priorities."[8] The article discussed the Company's 2023 Corporate Responsibility Report's disclosures of Biogen's efforts to improve corporate governance stating that "[Biogen's] efforts focused on four areas: access and health equity, workforce and DE&I, community impact and the environment."

120.    Despite this, skepticism regarding Aduhelm's regulatory approval continued to contribute to the drug's stunted success in the lucrative AD-treatment market. As such, the Company's launch of the Leqembi product is essential to mitigating the negative effects of the controversies on the Company's financial performance.

## FALSE AND MISLEADING STATEMENTS

### *February 3, 2022 Press Release*

121.    On February 3, 2022 the Company issued a press release during pre-market hours, disclosing Biogen's Q4 and FY 2021 results (the "Q4/FY2021 Earnings Release"). The Q4/FY2021 Earnings Release included Defendant Vounatsos's commentary on the Company's

---

[7] *Id.*
[8] *Biogen Reports Progress on Corporate Responsibility Priorities*, YAHOO! FINANCE (May 2, 2024)
https://finance.yahoo.com/news/biogen-reports-progress-corporate-responsibility-113000933.html.

success, as well as new developments. Specifically Defendant Vounatsos stated that "Biogen continued to execute well in [Q4] despite the challenges we have faced," and that "[w]e have introduced the first FDA approved treatment for [AD] in nearly 20 years, and we are engaging with the Centers for Medicare and Medicaid Services with the hope of finding a path for immediate patient access."

122.     In discussing Aduhelm, the Q4/FY2021 Earnings Release, stated, in relevant part,

> In [Q4] 2021 Biogen and Eisai presented data at the annual CTAD conference from approximately 7,000 plasma samples from more than 1,800 patients in the ADUHELM Phase 3 clinical trials showed a statistically significant correlation between plasma p-tau reduction and less cognitive and functional decline in [AD]. Reductions in plasma p-tau181 were also correlated with a lowering of amyloid beta plaque. The analysis of plasma samples was conducted by an independent lab, drawing from the two pivotal ADUHELM Phase 3 EMERGE and ENGAGE trials.

### *February 3, 2022 Form 10-K*

123.     That same day, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants McDonnell, Vounatsos, Denner, Dorsa, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin. Additionally, it contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McDonnell and Vounatsos attesting to its accuracy.

124.     The 2021 10-K supposedly included a warning of risks that "may," "might," or "could" occur "if" Biogen or its employees committed wrongful acts or participated in wrongful conduct abroad. However, risk of potential issues arising was minimized by assuring investors that the Company's compliance controls, policies and procedures aptly mitigated these risks, stating, in relevant part:

> Our activities, and the activities of our collaborators, distributors and other third-party providers, are subject to extensive government regulation and oversight in the

U.S. and in foreign jurisdictions, and are subject to change and evolving interpretations, which *could* require us to incur substantial costs associated with compliance or to alter one or more of our business practices . . . **If** we, or our vendors or donation recipients, are found to fail to comply with relevant laws, regulations or government guidance . . . we *could* be subject to significant fines or penalties. Risks relating to compliance with laws and regulations *may* be heightened as we continue to expand our global operations and enter new therapeutic areas with different patient populations, which *may* have different product distribution methods, marketing programs or patient assistance programs from those we currently utilize or support.

\* \* \*

Violations of governmental regulation *may* be punishable by criminal and civil sanctions, including fines and civil monetary penalties and exclusion from participation in government programs . . . as well as against executives overseeing our business . . . In addition, legal proceedings and investigations are inherently unpredictable, and large judgments or settlements sometimes occur. While we believe that ***we have appropriate compliance controls, policies and procedures in place to comply with the laws or regulations of the jurisdictions in which we operate***, there is a risk that acts committed by our employees, agents, distributors, collaborators or third-party providers *might* violate such laws or regulations. Whether or not we have complied with the law, an investigation or litigation related to alleged unlawful conduct *could* increase our expense, damage our reputation, divert management time and attention and adversely affect our business.

(Emphases added.)

125.    The aforementioned risk warnings failed to acknowledge actual known risks the Company faced due to Individual Defendants' failure to maintain efficient compliance controls, policies and procedures related to employees' illegal, illicit, or otherwise improper conduct in foreign countries. Instead, the warnings served as boilerplate provisions covering all possibilities not explicitly stated, including Biogen's business operations abroad.

126.    Moreover, the 2021 10-K appeared to warn of "possible" risks that "may" or "could" occur "if" Biogen or its employees violated any laws prohibiting foreign corrupt practices, while again minimizing these risks by simultaneously affirming that the Company had effective compliance controls, policies, and procedures in place to reduce risks, stating, in relevant part:

[O]ur international operations are subject to regulation under U.S. law. For example, the U.S. Foreign Corrupt Practices Act (FCPA) prohibits U.S. companies and their representatives from paying, offering to pay, promising to pay or authorizing the payment of anything of value to any foreign government official, government staff member, political party or political candidate for the purpose of obtaining or retaining business or to otherwise obtain favorable treatment or influence a person working in an official capacity. In many countries, the health care professionals we regularly interact with *may* meet the FCPA's definition of a foreign government official. Failure to comply with domestic or foreign laws *could* result in various adverse consequences, including *possible* delay in approval or refusal to approve a product, recalls, seizures or withdrawal of an approved product from the market, disruption in the supply or availability of our products or suspension of export or import privileges, the imposition of civil or criminal sanctions, the prosecution of executives overseeing our international operations and damage to our reputation . . . . [W]hile we believe that *we have appropriate compliance controls, policies and procedures in place to comply with the FCPA,* there is a risk that acts committed by our employees, agents, distributors, collaborators or third-party providers *might* violate the FCPA and we *might* be held responsible. *If* our employees, agents, distributors, collaborators or third-party providers are found to have engaged in such practices, we could suffer severe penalties and *may* be subject to other liabilities, which *could* negatively affect our business, operating results and financial condition.

(Emphases added.)

127.    These risk warnings were also common, catch-all language that were not customized to the Company's actual known risks concerning its failure to maintain proper compliance controls, policies, and procedures related to Biogen's business operations in foreign countries, let alone the Company's actual known risks concerning its or its employees' illegal, illicit, or otherwise improper activities abroad.

### *2022 Proxy Statement*

128.    On April 29, 2022, the Company filed its 2022 Proxy Statement. Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

44

129.    The 2022 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022; and (3) hold an advisory vote on executive compensation.

130.    With respect to the Company's Code of Business Conduct, the 2022 Proxy Statement stated:

> Biogen is committed to leadership actions across all aspects of ESG. Our Board of Directors has oversight of ESG matters and as an element of our commitment to corporate responsibility throughout the company, employees are required to complete annual training in ethics, as part of training on the Biogen Code of Business Conduct.
>
> For more information on our commitment to addressing environmental, social and governance aspects across our business, please see our report, **Year in Review: Our Commitment to Corporate Responsibility**, which is posted on our website, www.biogen.com, under the "Corporate Responsibility" section of the website. We believe these efforts reflect the best interests of our employees, our patients, our stockholders and various other stakeholders, including the communities in which we operate and serve.
>
> Furthermore, we are committed to transparent and clear disclosure of our policies and performance on a broad array of issues. Our Year in Review meets the Global Reporting Initiative framework and aligns with the Sustainability Accounting Standards Board, the Task Force on Climate-Related Financial Disclosures, the United Nations Global Compact Sustainable Development Goals and the World Economic Forum Stakeholder Capitalism Metrics.

131.    Regarding the Role of the Board of Directors in Risk Oversight, the 2022 Proxy Statement said:

> Our Board of Directors oversees the management of material risks facing the Company. Biogen is committed to fostering a company culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation. Our Board of Directors and its committees oversee our efforts to foster this culture. Our Board of Directors regularly receives information about our material strategic, operational, financial and compliance risks and management's response to, and

45

mitigation of, such risks. In addition, our risk management systems, including our risk assessment processes, internal control over financial reporting, compliance programs and internal and external auditing procedures, are designed to inform management and our Board of Directors about our material risks. As part of its risk oversight function, our Board of Directors and its committees review this framework, its operation and our strategies for generating long-term value for our stockholders to ensure that such strategies will not motivate management to take excessive risks.

Our Board of Directors also reviews enterprise risks and discusses them with our management, including issues relevant to our business, reputation and strategy, including intellectual property risk, pipeline and business development, pricing and patient access, legal and regulatory matters and manufacturing. In addition, our Board of Directors and its committees oversee elements of our culture. Management updates our C&MD Committee on our compensation practices and progress against strategies and objectives in the areas of management and leadership development and diversity as well as steps taken to address matters such as inappropriate workplace behavior, including harassment and retaliation. In addition, our Audit Committee is responsible for the oversight of our compliance program.

In determining the allocation of risk oversight responsibilities, our Board of Directors and its committees generally oversee material risks within their identified areas of concern. Our Board of Directors and each of its committees meet regularly with management to ensure that management is exercising its responsibility to identify relevant risks and is adequately assessing, monitoring and taking appropriate action to mitigate risk. In the event a committee receives a report from members of management on areas of material risk to the Company, the Chair of the relevant committee reports on the discussion to the full Board of Directors at the next Board of Directors meeting. This enables our Board of Directors and its committees to coordinate their oversight of risk and identify risk interrelationships.

132.    With regards to the Audit Committee's oversight responsibility, the 2022 Proxy

Statement stated:

The Audit Committee's role is to act on behalf of our Board of Directors in the oversight of Biogen's financial reporting, internal control and audit functions. The roles and responsibilities of the Audit Committee are set forth in the written charter adopted by our Board of Directors, which is posted on our website, *www.biogen.com*, under the "Corporate Governance" subsection of the "Investors" section of the website. Management has primary responsibility for the financial statements and the reporting process, including the systems of internal control.

133.    Defendants McDonnell, Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin, and Vounatsos caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Business Conduct. Further, the 2022 Proxy Statement

was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

135.    As a result of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin, and Vounatsos causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin to the Board, allowing them to continue breaching their fiduciary duties to the Company, (2) ratify the selection of PricewaterhouseCoopers LLP as Biogen's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve, on an advisory basis, compensation of the Company's named executive officers.

### *January 6, 2023 Joint Press Release*

136.    On January 6, 2023, the Company and Eisai issued a joint press release announcing the FDA's approval of Leqembi as a treatment for AD under the FDA's Accelerated Approval Pathway.

137.    On January 6, 2023, Biogen and Eisai publicized its upcoming launch of Leqembi. It issued a press release announcing the FDA's approval of Leqembi as a treatment for AD under the FDA's Accelerated Approval Pathway. Regarding patient access to Leqembi, the press release stated, in relevant part:

> The Eisai Patient Support Program offers several support programs to help patients and care partners. Dedicated Patient Navigators will work directly with patients and families to navigate treatment and coverage for eligible and appropriate patients and to help with what to expect regarding insurance coverage, co-pay and patient access programs.
>
> * * *
>
> In addition, to support access to LEQEMBI for certain financially disadvantaged patients, Eisai's Patient Assistance Program (PAP) will provide LEQEMBI at no

cost, for eligible uninsured and underinsured patients, including Medicare
beneficiaries, who meet financial need and other program criteria. Eisai looks
forward to continuing to engage constructively with various payors, including the
Centers for Medicare and Medicaid (CMS), TRICARE, the U.S. Veteran's Health
Administration and private health insurance companies to ensure appropriate
beneficiaries have access to this new therapy . . . . Medicaid sole beneficiaries who
are diagnosed by a healthcare professional with mild cognitive impairment or mild
dementia stage of disease, and with confirmed presence of amyloid plaque in the
brain will have access to LEQEMBI under the Medicaid program post accelerated
approval, depending on individual state processes.

### *February 15, 2023, Q4/FY2022 Press Release*

138.    On February 15, 2023, the Company issued a press release announcing its Q4 and

2022 Fiscal Year results (the "Q4/FY2022 Press Release"). The Q4/FY 2022 press release

included 2023 Fiscal Year non-GAAP diluted EPS guidance in a range of $15.00 to $16.00 per

share and warned, in relevant part, that:

> This financial guidance does not include any impact from potential acquisitions or
> large business development transactions or pending and future litigation, as all are
> hard to predict, or any impact of potential tax or healthcare reform. Biogen may
> incur charges, realize gains or losses, or experience other events or circumstances
> in 2023 that could cause any of these assumptions to change and/or actual results
> to vary from this financial guidance.

139.    Like the risk warnings mentioned earlier, the language above is a boilerplate, all-

encompassing provision that was not customized to the Company's actual known risks. It fails to

note Biogen's impending acquisition of Reata and/or other companies, let alone the potential

discontinuation of Aduhelm's development and commercialization. This provision also fails to

address how these factors would have adverse effects on the Company's EPS.

### *February 15, 2023 Form 10-K*

140.    On February 15, 2023, the Company filed an annual report on Form 10-K with the

SEC for the fiscal quarter and year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K

was signed by Defendants McDonnell, Vounatsos, Denner, Dorsa, Freire, Hawkins, Jones, Mantas,

Mulligan, Rowinsky, and Sherwin. The 2022 10-K contained SOX certifications signed by Defendants McDonnell and Viehbacher attesting to its accuracy.

141.    The 2022 10-K included the same boilerplate risk warnings providing warning of any potential issues that "may", "might", or "could" occur "if" the Company or its employees participated in improper or wrongful conduct abroad, as well as "possible" risks that "may" or "could" occur "if" Biogen or its employees violated any laws barring foreign corrupt practices. In doing so, the Company continued to minimize the potential risks by affirming that Biogen's compliance management, including its compliance controls, policies, and procedures, could effectively reduce these risks.

### *April 25, 2023 Press Release*

142.    On April 25, 2023, Biogen issued a press release (the "April 2023 Press Release") disclosing the financial results of its first quarter of the 2023 Fiscal Year. The April 2023 Press Release reiterated the Company's 2023 Fiscal Year non-GAAP diluted EPS guidance within the range of $15.00 to $16.00 per share, while including the same boilerplate, all-encompassing risk warnings. Like the risk warnings mentioned earlier, these provisions were not customized to the Company's actual known risks related to its impending acquisition of Reata and/or other companies to counteract the decreasing MS-related product sales, let alone the potential discontinuation of Aduhelm's development and commercialization, and the adverse effects that would impact the Company's 2023 EPS.

### *2023 Proxy Statement*

143.    On April 28, 2023, the Company filed the 2023 Proxy Statement. Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin

solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

144.    The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin and Viehbacher, to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) hold an advisory vote on executive compensation; and (4) hold an advisory vote on the frequency of future advisory votes on executive compensation.

145.    With respect to the Company's Code of Business Conduct, the 2023 Proxy Statement stated:

> Biogen is committed to leadership actions across all aspects of ESG. Our Board of Directors has oversight of ESG matters and as an element of our commitment to corporate responsibility throughout the company, employees are required to complete annual training in ethics, as part of training on the Biogen Code of Business Conduct.
>
> For more information on our commitment to addressing environmental, social and governance aspects across our business, please see our report, **Year in Review: Our Commitment to Corporate Responsibility**, which is posted on our website, www.biogen.com, under the "Corporate Responsibility" section of the website. We believe these efforts reflect the best interests of our employees, our patients, our stockholders and various other stakeholders, including the communities in which we operate and serve.
>
> Furthermore, we are committed to transparent and clear disclosure of our policies and performance on a broad array of issues. Our Year in Review meets the Global Reporting Initiative framework and aligns with the Sustainability Accounting Standards Board, the Task Force on Climate-Related Financial Disclosures, the United Nations Global Compact Sustainable Development Goals and the World Economic Forum Stakeholder Capitalism Metrics.

146.    Regarding the Role of the Board of Directors in Risk Oversight, the 2023 Proxy Statement said:

> Our Board of Directors oversees the management of material risks facing the Company. Biogen is committed to fostering a company culture of risk-adjusted

decision-making without constraining reasonable risk-taking and innovation. Our Board of Directors and its committees oversee our efforts to foster this culture. Our Board of Directors regularly receives information about our material strategic, operational, financial and compliance risks and management's response to, and mitigation of, such risks. In addition, our risk management systems, including our risk assessment processes, internal control over financial reporting, compliance programs and internal and external auditing procedures, are designed to inform management and our Board of Directors about our material risks. As part of its risk oversight function, our Board of Directors and its committees review this framework, its operation and our strategies for generating long-term value for our stockholders to ensure that such strategies will not motivate management to take excessive risks.

Our Board of Directors also reviews enterprise risks and discusses them with our management, including issues relevant to our business, reputation and strategy, including intellectual property risk, pipeline and business development, pricing and patient access, legal and regulatory matters and manufacturing. In addition, our Board of Directors and its committees oversee elements of our culture. Management updates our C&MD Committee on our compensation practices and progress against strategies and objectives in the areas of management and leadership development and diversity as well as steps taken to address matters such as inappropriate workplace behavior, including harassment and retaliation. In addition, our Audit Committee is responsible for the oversight of our compliance program.

In determining the allocation of risk oversight responsibilities, our Board of Directors and its committees generally oversee material risks within their identified areas of concern. Our Board of Directors and each of its committees meet regularly with management to ensure that management is exercising its responsibility to identify relevant risks and is adequately assessing, monitoring and taking appropriate action to mitigate risk. In the event a committee receives a report from members of management on areas of material risk to the Company, the Chair of the relevant committee reports on the discussion to the full Board of Directors at the next Board of Directors meeting. This enables our Board of Directors and its committees to coordinate their oversight of risk and identify risk interrelationships.

147.    With regards to the Audit Committee's oversight responsibility, the 2023 Proxy

Statement stated:

The Audit Committee's role is to act on behalf of our Board of Directors in the oversight of Biogen's financial reporting, internal control and audit functions. The roles and responsibilities of the Audit Committee are set forth in the written charter adopted by our Board of Directors, which is posted on our website, *www.biogen.com*, under the "Corporate Governance" subsection of the "Investors" section of the website. Management has primary responsibility for the

financial statements and the reporting process, including the systems of internal control.

148.    Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

149.    The 2023 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct and Audit Committee Charter were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Business Conduct or the Audit Committee Charter. Further, the

2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

150.    As a result of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Leaming, Mantas, Mulligan, Papadopoulos, Posner, Rowinsky, and Sherwin causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including the election of Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct.

### *2022 ESG Report*

151.    On May 1, 2023, the Company issued a press release publicizing the publication of its ESG Report for the 2022 Fiscal Year (the "2022 ESG Report"). The 2022 ESG Report claimed to "support[] Biogen's business goals by sharing our corporate responsibility story, disclosing key [ESG] data and providing updated progress against our targets and commitments."

152.    Included in the 2022 ESG Report was a letter from Defendant Viehbacher, stating, in relevant part:

> For decades, Biogen has been committed to corporate responsibility and, every day, we are working diligently to build upon our long-held foundation of responding appropriately to emerging stakeholder expectations and industry trends to deliver benefits for patients and communities. * * * I want to underscore my commitment – reflected in this report – to continuing to advance Biogen's culture of transparency and disclosure so that our stakeholders, including our employees, patients, investors, partners and communities, have access to reliable data-driven information about all the dimensions of our business.

153.    The ESG Report also emphasized the Company's efforts to maintain communication with investors and analysts, explaining that through its engagement with "[i]nvestors, analysts and ratings agencies through [*inter alia*] . . . our transparent responses to inquiries from organizations like S&P Global, JUST Capital and others."

154.    Moreover, the 2022 ESG Report acknowledged the Company's responsibility to oversee proper management in a section titled "Operating responsibly," which stated, in relevant part:

> Maintaining high standards for corporate responsibility helps us deliver on our purpose and on advancing a healthier, more sustainable and equitable world.
>
> **Advancing an ethical culture**
>
> Every action we take, from pioneering new therapies to promoting health equity, is guided by our unwavering commitment to integrity through:
>
> – **Biogen's credo** – Caring Deeply. Working Fearlessly. Changing Lives.™
>
> – **Biogen Elements** – the foundation of our culture. Just as the periodic table reflects the elements of our universe, the Biogen Elements include pioneering spirit, strong ethics, personal accountability, inclusivity, agility and unwavering customer focus.
>
> – **Code of Business Conduct** – which includes eight Ethical Principles and applies to all Biogen employees, agents and consultants acting on behalf of Biogen and our Affiliates worldwide.
>
> We see these commitments as key enablers of Biogen's business, and in honoring them, we foster an environment of trust, honesty and transparency while ensuring appropriate confidentiality.

(Emphases in original.)

155.    In discussing the Company's compliance management, the 2022 ESG Report emphasized the Company's strong global policies and procedures, stating, in relevant part:

> Compliance with our Code of Business Conduct, Ethical Principles and the law is mandatory for all employees and a priority of our leaders, without exception.
>
> At the enterprise level, we monitor and address compliance issues very closely. We have more than 20 full-time compliance officers who are embedded with the businesses globally. They use advanced artificial intelligence and other tools and technology to identify and address potential issues.
>
> We also require every employee to report actual or suspected violations of the law or the Code of Business Conduct either to their manager, to a compliance officer or

through an anonymous 24/7 helpline . . . . All claims of misconduct . . . are thoroughly investigated.

***July 6, 2023 Joint Press Release***

156.    The Company and Eisai issued a joint press release (the "July 6, 2023 Press Release") on July 6, 2023. The press release revealed that the FDA had granted the traditional approval of Leqembi as treatment for AD. The July 6, 2023 Press Release highlighted the broad coverage of Leqembi and held the drug out to be easily accessible, stating, in relevant part:

> Importantly, following FDA's traditional approval of LEQEMBI, CMS confirmed that broader coverage of LEQEMBI is now available and released more details on the registry, including the easy-to-use data submission process. The CMS facilitated registry is now available for healthcare professionals to submit required patient data to CMS. Eisai is pleased that Medicare will cover this important therapy for appropriate patients. This will facilitate reimbursement for and access to LEQEMBI across a broad range of healthcare settings in the [U.S.].
>
> * * *
>
> Eisai is committed to ensuring that appropriate patients have access to LEQEMBI and has established a Patient Assistance Program to provide LEQEMBI at no cost, for eligible uninsured and underinsured patients, including Medicare beneficiaries, who meet financial need and other program criteria. Additionally, Eisai offers patient support for improving access through LEQEMBI Patient Navigators, who will provide information about accessing LEQEMBI, help patients and their families understand their insurance coverage and options, and identify financial support programs for eligible patients.

157.    The July 6, 2023 Press Release quoted Eisai's CEO, who emphasized the companies' continued efforts to make the drug accessible, stating in relevant part, that "[w]e continue to work to create broad and simple access to LEQEMBI for patients and to support diagnosis and treatment at the early stage of the disease."

158.    Defendant Viehbacher was also quoted in the July 6, 2023 Press Release as saying "[o]ur focus is now on the path forward, working alongside Eisai with the goal of making LEQEMBI accessible to eligible patients as soon as possible."

***July 25, 2023 Q2 2023 Press Release***

159.    The Company reported its second quarter 2023 financial results in a press release issued on July 25, 2023 (the "Q2 2023 Press Release"). The Q2 2023 Press Release reconfirmed the Company's 2023 Fiscal Year non-GAAP diluted EPS guidance within the range of $15.00 to $16.00 per share, in addition to including a boilerplate, catch-all risk warning provision, which was not customized to the Company's actual known risks related to its impending acquisition of Reata and/or other companies to counteract its declining MS-related product sales, let alone the potential discontinuation of Aduhelm's development and commercialization. This provision also failed to address how these factors would have adverse effects on the Company's EPS.

### *July 28, 2023 Press Release*

160.    The beginning of the Company's acquisition of Reata was announced in a press release issued on July 28, 2023 (the "July 28, 2023 Press Release"). The July 28, 2023 Press Release explained that the "[p]roposed acquisition represents meaningful step forward in Biogen's strategy for sustainable growth, adding a highly complementary innovative product in an area of high unmet medical need"; and that the acquisition is "[e]xpected to be significantly accretive to Biogen's Non-GAAP diluted EPS beginning in 2025[.]"

161.    Additionally, the July 28, 2023 Press Release reported, in relevant part:

> The acquisition of Reata is expected to be slightly dilutive to Biogen's Non-GAAP diluted [EPS] in 2023, roughly neutral in 2024, and significantly accretive beginning in 2025, inclusive of assocFiated transaction costs. Biogen plans to update its [FY] 2023 Financial Guidance in conjunction with its [Q3] 2023 earnings release. (Emphasis added.)

### *Comprehensive Compliance Program*

162.    In July 2023, the Company published a compliance report (the "2023 Compliance Report") on the "Governance Documents" section of Biogen's website. This report was titled "Comprehensive Compliance Program" and stated the following, *inter alia*:

Biogen is committed to . . . maintaining the highest level of integrity and ethical behavior in the conduct of our business. To this end, Biogen's Code of Business Conduct is available to the public through its posting on this website.

To conduct our business with integrity and ethically, Biogen has established and maintains a compliance program. This program has been developed in accordance with the laws applicable to our industry and the "Program Guidance for Pharmaceutical Manufacturers" published by the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG Guidance"). Moreover, the Pharmaceutical Research and Manufacturers of America, the pharmaceutical industry's trade group, voluntarily adopted its own "Code on Interactions with Healthcare Professionals" known as the "PhRMA Code." Biogen's compliance program requires compliance with the PhRMA Code, which addresses topics such as informational presentations by the Company, third party continuing education and professional meetings, use of consultants and speakers, as well as restrictions on the provision of gifts and financial incentives to healthcare professionals.

163.    The 2023 Compliance Report also mentioned that the Company's compliance program incorporates the "[u]se of audits and other techniques to monitor compliance and identify and address of [sic] risk"; "[e]nforcement of compliance obligations through guidelines that include penalties for noncompliance"; and "[m]echanisms to promptly and properly investigate and respond to reports of noncompliance, including processes to initiate corrective measures and to report offenses to the relevant government authorities where appropriate." In doing so, Biogen provided false reassurance to the public that Biogen had developed a strong compliance program that can effectively monitor, identify, enforce, and resolve issues regarding non-compliance allowing for the opportunity to report such instances to relevant authorities.

164.    Additionally, in the 2023 Compliance Report, the Company held itself out as abiding by compliance protocols when stating, "as of July 1, 2023, Biogen is in material compliance with its Comprehensive Compliance Program[.]"

### *September 26, 2023 Press Release*

165.    On September 26, 2023, Biogen reported that the acquisition of Reata was complete in a press release, stating, in relevant part:

Biogen anticipates significant synergies with its existing rare disease portfolio and plans to update its [FY] 2023 Financial Guidance in conjunction with its [Q3] 2023 earnings release. The acquisition of Reata is expected to be slightly dilutive to Biogen's Non-GAAP diluted [EPS] in 2023, roughly neutral in 2024, and significantly accretive beginning in 2025, inclusive of associated transaction costs.

(Emphasis added.)

166.    The statements in ¶¶ 121-126, 136-138, 140-142, and 151-165 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls.

## THE TRUTH BEGINS TO EMERGE WHILE FALSE AND MISLEADING STATEMENTS CONTINUE

### *November 8, 2023 Q3 2023 Earnings Release*

167.    The Company issued a press release on November 8, 2023, during pre-market hours, announcing its 3Q financial results for the 2023 Fiscal Year (the "Q3 2023 Earnings Release"). In the press release, Biogen updated its non-GAAP diluted EPS guidance for the 2023 Fiscal Year to a range of $14.50 to $16.00 per share, quoting approximately $0.75 of dilution from the Reata Acquisition.

168.    On this news, the Company's stock price fell $13.92 per share, or 5.67%, to close at $231.69 per share on November 8, 2023. Although Biogen's stock price faced a sudden decrease, the Company's shares continued to be traded at artificially inflated prices throughout the rest of the Relevant Period. This was due to the Individual Defendants' extensive misstatements and omissions related to Biogen's compliance management, in addition to the Company's launch of the accessible Leqembi product, which ultimately strengthened Biogen's product portfolio.

***November 8, 2023 Q3 Earnings Release***

169.    That same day, misstatements made by Biogen began surfacing with the issuance of the Company's Q3 earnings release (the "Q3 Earnings Release"). The Q3 Earnings Release included boilerplate, all-encompassing provisions that do not reflect Biogen's actual known risks tied to its probable discontinuation of Aduhelm's development and commercialization, such as close-out costs amounting to tens-of-millions of dollars. These risk warnings are too general and fail to describe how the effects of pulling Aduhelm out of the market would drastically impact Biogen's EPS for 2023.

***November 28, 2023 Q3 Earnings Call***

170.    Later that day, Biogen held its Q3 conference call (the "Q3 2023 Earnings Call"), where it discussed Biogen's Q3 earnings with investors and analysts. During the call, Defendant

Viehbacher emphasized his high hopes for having 10,000 patients using Leqembi by the end of

March 2024, stating, *inter alia*:

> So, of course, we have an aim of getting to 10,000 patients by the end of March.
> We're at 800 now. What gives us the confidence that we think we can get there? I
> think we have a number of greenshoots here, signs of progress. The first is, as we
> look at our internal metrics of intent to treat and patient demand, we are seeing all
> of those things progress extremely nicely. The FDA not only provided traditional
> approval, but CMS actually moved very quickly, the day of traditional approval, as
> they promised. They actually have provided reimbursement and the patient registry
> has so far from what we hear from the market been relatively easy to use.

> * * *

> I think one of the most interesting things is we've got 60% of the top 100 targeted
> IDMs now having P&T [pharmacy and therapeutics] approval. And one of the
> things that really gives me a lot of inspiration is usually these P&T committees
> meet twice a year, but a number of them actually have organized special meetings
> just for LEQEMBI and not wait until the next meeting. And that says to me that
> there's a recognition of the importance of this treatment and being able to get
> patients on treatment.

> * * *

> So now, of course, we're also looking at executing on geographic expansion. We've
> had the recent approval of Japan and I'm traveling to Japan early in the new year
> to be with my friend and colleague, the CEO of Eisai to launch LEQEMBI in Japan.
> And of course, we've got global filings under review in the EU, China and 10 other
> markets. So this is one where we're going to have to be patient, but all the signs are
> green at this moment. And for us, internally, we see a launch that is on track.

### December 12, 2023 Leqembi Launch Press Release

171.    The Company and Eisai announced the highly anticipated launch of Leqembi for

the treatment of AD in Japan in a joint press release issued by both companies on December 12,

2023 (the "December 2023 Press Release"). The CEO of Eisai was quoted as saying the following,

in relevant part, in the December 2023 Press Release:

> The establishment of an optimal and fast [AD] diagnosis and treatment pathway for
> patients is a top priority, and close collaboration among the government, dementia
> specialists, primary care physicians, radiologists, pharmacists, nurses, clinical
> psychologists, radiology staff, medical office personnel, and caregivers is essential
> for this purpose. In consideration of the importance of [AD] in Japan, we believe it

is imperative that such pathways be established. We are committed to taking this first step towards changing the future of [AD] together with our stakeholders.

172. Defendant Viebacher was also quoted in the December 2023 Press Release as touting the future success of Leqembi, saying, in relevant part:

The availability of LEQEMBI opens a new era in the treatment of [AD] . . . . We will work alongside Eisai to engage the medical community and support the patient journey, especially early diagnosis[.]

173. The statements referenced in ¶¶169-172 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Biogen's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*January 8, 2024 J.P. Morgan Conference*

174.    During the J.P. Morgan Conference, Defendant Viehbacher mentioned the
Company was facing challenges with the launch of Leqembi. Upon disclosing these new
circumstances, Defendant Viehbacher pulled back on previous expectations of having 10,000
patients using Leqembi by the end of March 2024. He specifically stated, in relevant part:

> Remember, the 10,000 was really designed to try to give people some sort of
> milestone, because there are no real analogues for this launch. I haven't found a
> decent analog anywhere. So, what I think we were trying to say is, this isn't going
> to be 100,000 patients, but it is not going to be 1,000 either. So that is a trajectory.
> And I think where we are right now, there is nothing that we are going to do that's
> going to change us on the trajectory. We will get there. We don't get there. I think
> everything we are seeing. There is no reason to say that, we can't get there. But
> again, the data were kind of choppy in December. So, for me, I am really looking
> for the January data. But where we are right now is, 10,000 isn't really what we are
> interested anymore. It's how do we now get to the 100,000? And so that's where
> we are focused. But you can't get to the 100,000 unless you have really got this go-
> to-market strategy really nailed down. And I think we are increasingly confident in
> that model.

175.    On this news, the Company's stock price fell $10.77 per share, or 4.17%, over three
consecutive trading dates to a closing price of $247.21 per share on January 11, 2024. Although
Biogen's stock price dipped, the Company's shares continued to be traded at artificially inflated
prices throughout the rest of the Relevant Period. This was due to the Individual Defendants'
extensive misstatements and omissions related to Biogen's compliance management, in addition
to the Company's launch of the accessible Leqembi product, which ultimately strengthened
Biogen's product portfolio.

176.    Examples of misstatements include additional comments made by Defendant
Viehbacher at the J.P. Morgan Conference regarding the launch of Leqembi and its accessibility,
such as the following, *inter alia*:

> So, numbers of PET scans are going up. When we talk to people who are providing
> the PET scans, they're seeing lots of activity. People who are providing the

bloodbased biomarkers and diagnostics are seeing increased activity. We're seeing a significant increase in the numbers of new patient starts on the registry. And in terms of reimbursement, CMS said, "Okay, we're now changing and clarifying the reimbursement for PET scans." But that has to be pulled through by the dozen or so max that are out there. And they typically don't move that quickly, but they have moved faster than anybody has ever seen before. A lot of the IDMs were on formulary, and they have done out of cycle, P&T committee meetings because they see it as an urgency. We certainly have patients waiting for treatment. So, the real job is just establishing the care, pathways getting the policies in place and the blocking and tackling of being able to process the patients. So, I think we're feeling pretty good. I'm looking forward to seeing how the January sales play out. A lot of positive data in December, but December is kind of a funny month with the holiday schedule, but I think we're certainly seeing an awful lot of tremendous progress on LEQEMBI.

\* \* \*

We're not seeing any capacity constraints on PET scans nor on MRIs nor on infusion centers for the moment. So, I think that will flex. So largely, it is really around the care pathways and just establishing those. And that increases every day when the number of centers ordering from, when we did Q3 earnings to now was up 37%, for example. \* \* \* [I]t's starting to broaden out. There's still - we've probably got about a target of 10,000, and we're working our way through that.

\* \* \*

177.    The Company and Biogen issued a joint press release on January 9, 2024 publicizing Leqembi's approval for the treatment of AD in China, stating the following, in relevant part:

Eisai estimates that there will be 17 million patients with MCI or mild dementia due to AD in China in 2024, which is expected to increase with the aging of the population. Eisai will distribute the product in China and will conduct information provision activities through specialized Medical Representatives. Moving forward, Eisai will focus on AD awareness via omnichannel systems and collaborate with specialists to improve the diagnostic environment, including blood-based biomarkers. In addition, by utilizing online health platform for the elderly "Yin Fa Tong"\*\*, which is already being accessed by a certain number of users and helping provide treatments, Eisai is providing a one-stop service that promotes early consultation by referring patients to medical specialists and follow-up after treatment. In addition, Eisai will work to improve access environments including the development of insurance programs for AD in collaboration with insurance companies. Through these efforts, Eisai will accelerate the construction of a simple patient journey in China.

178.    The statements referenced in ¶¶169-172 and 176-177 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Biogen's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

179.    Biogen shocked investors and analysts on January 31, 2024 when it issued a press release that revealed Biogen was discontinuing Aduhelm's development and commercialization. Per the press release, Biogen had recorded $60 million in associated close-out costs, stating, in relevant part:

Biogen . . . plans to reprioritize its resources in [AD] . . . . The company will discontinue the development and commercialization of ADUHELM® (aducanumab-avwa) 100 mg/mL injection for intravenous use and will terminate the ENVISION clinical study.

\* \* \*

In January 2023, Biogen began a strategic review of its research and development efforts, including seeking potential partners or external financing for ADUHELM, as part of a focus on prioritizing the company's portfolio. During this process, Biogen considered the time and investment required for the post-marketing confirmatory ENVISION study and the likely advancements in the field by the time of potential ADUHELM FDA traditional approval. Despite an extensive process, the company did not identify potential strategic partners or external financing. Biogen has recorded a one-time charge of approximately $60 million related to close out costs for the program in the fourth quarter of 2023.

180.    Less than a week later, on February 6, 2024, news reports revealed that Eisai was facing issues with the launch of Leqembi. Leqembi had only been administered to 2,000 patients in the U.S., making reaching the Company's goal of having 10,000 patients on Leqembi by the end of March 2024 unlikely.

181.    On February 6, 2024, *Bloomberg* published an article titled, "Eisai's New Alzheimer's Drug Is Falling Short of US Target." The article noted, in relevant part, that:

Eisai Co. said its breakthrough Alzheimer's drug has been administered to 2,000 patients in the US, falling behind a target of 10,000 people by the end of March. The medicine is approved for use in three countries so far — the US, Japan and China. About 100 people have used the drug, named Leqembi, in Japan as of Feb. 5, Eisai said in documents released along with earnings on Tuesday. The company also said it's preparing to start selling the drug in China in the second quarter of the 2024 fiscal year.

182.    On this news, the Company's stock price fell $5.01 per share, or 2.04%, to close at $240.54 per share on February 7, 2024.

183.    Soon after, the Company issued a press release on February 13, 2024, during pre-market hours, reporting its Q4 and 2023 Fiscal Year results (the "Q4/FY 2023 Earnings Release"). The Q4/FY 2023 Earnings Release reported a Q4 non-GAAP EPS of $2.95, missing consensus estimates by $0.23, and Q4 revenue of $2.4 billion, missing consensus estimates by $60 million

and representing a 5.5% Y/Y decline. The Q4/FY 2023 Press Release cited Aduhelm's discontinuation as the main reason for the lower-than-expected Q4 EPS results, stating that Q4 "GAAP and Non-GAAP diluted EPS [was] negatively impacted by $0.35 related to [the] previously disclosed closeout costs for ADUHELM," with Q4 "2023 GAAP and Non-GAAP R&D [research and development] expense includ[ing] . . . approximately $60 million in close out costs related to ADUHELM."

184.    On February 13, 2024, during the Company's Q4/FY 2023 Earnings Call with investors and analysts, Defendant Viehbacher revealed how far behind the Company was from reaching its 10,000-patient goal for the end of March 2024, stating "we've got approximately 2,000 patients on [Leqembi] at the moment" and that "we have an indication that there are about 3,800 patients as of last week on the registry."

185.    As the Q4/FY 2023 Earnings Call began its question-and-answer segment, an analyst requested additional information on "the bottlenecks on the LEQEMBI launch." In response, Defendant Viehbacher stated, in relevant part:

> The bottlenecks, I still -- if you think about it, if the data from the patient registries are accurate, and again, we don't have direct access to that, but it suggests that we've got almost twice as many people on the registry as we do on treatment.
>
> And so that says that in addition to the bottleneck of getting into the neurologist, that there's -- when you get to the registry, you've got a clear intent to prescribe, because on the registry, at least for CMS, you have to describe how you actually validated the diagnosis. So by then, you've triaged the patient, you've done either the PET scan or the CSF markers, and you're looking for reimbursement.
>
> And what we're hearing a little bit is, is that there is some challenge in just scheduling the first MRI, because when we initiate the infusion, you have to have the first MRI within the first two weeks. So people don't want to initiate the infusion until they've got that MRI scheduled. And the MRI -- there isn't an MRI capacity constraint per se, but you are looking for a specific date, and then you have to back up the infusion. So there's just, I think, until people get the hang of this, getting all that coordination, I think that seems to be where the -- where one of the bottlenecks is.

186.    After the Q4/FY 2023 Earnings Release and the Q4/FY 2023 Earnings Call, several

analysts lowered their price target on Biogen's stock. *Bloomberg* disclosed that fourteen analysts

lowered their price targets on Biogen by an average of 5.7%. Moreover, J.P. Morgan lowered its

price target on Biogen stock by $20, reducing it from $290 to $270. Finally, Wells Fargo Securities

lowered its rating on Biogen stock from "Overweight" to "Equal Weight."

187.    On the same day, various news outlets reported on the Company's unsatisfactory

performance by highlighting the impacts of depressed MS-related product sales, the slow progress

of patients using Leqembi, and the close-out costs of Aduhelm.

188.    For example, *Bloomberg* published an article on February 13, 2024, titled "Biogen

Plunges as Alzheimer Drug's Slow Uptake Signals Reset." The article reported, in relevant part,

that:

> Biogen Inc. fell the most in two years as its latest foray into [AD] got off to a slow
> start, suggesting a long road to growth for the biotechnology giant. Just 2,000
> patients have been treated so far with Leqembi, Biogen said Tuesday, a warning
> that the Alzheimer's drug developed with Eisai Co. may miss its target of 10,000
> recipients by the end of March. Wall Street needs to reset its projections for the new
> drug, Wedbush Securities analyst Laura Chico said in a note, and Biogen's
> "turnaround story remains a work in progress." The shares fell as much 7.2% as of
> noon in New York, the most intraday since January 2022. After Biogen's Aduhelm
> failed to gain traction with Alzheimer's patients and payers, [Defendant]
> Viehbacher is focusing on Leqembi to replace sales of its [MS] treatments. MS
> drugs were long the company's mainstay and are now succumbing to cheaper
> alternatives.

189.    *Investopedia* also responded to the news released on February 13, 2024, by

publishing an article titled, "Biogen Tumbles as Drug Closeout Costs, Multiple Sclerosis Medicine

Sales Weigh on Profit." The article announced, *inter alia*, that "Biogen (BIIB) shares fell over 5%

in early trading Tuesday after the biotech firm posted weaker-than-expected results, weighed down

by costs for discontinuing a controversial Alzheimer's drug, Aduhelm, and slowing sales of [MS]

medicines." The article reported that "EPS was negatively impacted by 35 cents, related to previously disclosed closeout expenses for Aduhelm," "which faced criticism about its effectiveness and costs."

190.    Furthermore, *Reuters* published an article on February 13, 2024, titled "Biogen sees flat 2024 sales, pick up in Alzheimer's drug demand." The article stated, in relevant part:

> Since CEO [Defendant] Viehbacher took the helm at Biogen in late 2022, the company has cut jobs, acquired rare disease drugmaker Reata for $6.5 billion and abandoned controversial Alzheimer's drug Aduhelm, as he works to steer the company back to growth. Biogen is counting on newer medicines, including a second approved Alzheimer's drug Leqembi developed with Japanese partner Eisai, to drive growth for the next few years. Based on data from an Alzheimer's Association patient registry, Biogen estimates that as of last week there were 3,800 patients prescribed or close to being prescribed Leqembi, an increase of about 56% from December.

> * * *

> Wall Street analysts no longer expect the drug to hit a target of 10,000 patients by March after Eisai last week said there were only 2,000 patients taking Leqembi so far.

> * * *

> Biogen said it and Eisai plan to increase the U.S. Leqembi sales force by 30% as they seek to boost sales.

> "That's a meaningful expansion. You wouldn't be doing that if you felt that the product was going to make $10 million in a quarter," said William Blair analyst Myles Minter[.]

> "So the debate is all about: is Leqembi that massive $6 billion plus product, or is it something that's going to remain niche," Minter said in an interview.

191.    On February 14, 2024, the Company filed its 2023 10-K, revealing it was currently under investigation by the DOJ. The 2023 10-K stated, in relevant part:

> The Company has received a subpoena from the DOJ seeking information relating to our business operations in several foreign countries. The Company is also providing information relating to our business operations in several foreign countries to the SEC.

192.    Multiple news outlets immediately began reporting on the controversy. For instance, on February 14, 2023, *Reuters* published an article titled "Biogen gets DOJ subpoena on business operations in foreign countries." The article reported, in relevant part:

> Biogen . . . has received a subpoena from the [DOJ] seeking information relating to the company's business operations in several foreign countries, the drugmaker disclosed in a regulatory filing on Wednesday.
>
> Biogen also said it is providing information on foreign business operations to the [SEC].
>
> When contacted by Reuters, the company did not disclose details on the subpoena and said it "does not comment on investigations".
>
> The DOJ and the SEC did not immediately respond to Reuters' requests for comments.

193.    On this news, the Company's stock price dropped $5.91 per share, or 2.61%, to close at $220.74 per share on February 14, 2024.

## DAMAGES TO BIOGEN

194.    As a direct and proximate result of the Individual Defendants' conduct, Biogen has lost and expended, and will lose and expend, many millions of dollars.

195.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

196.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

197.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

198.    Such expenditures will also include costs incurred in the SEC and Department of Justice investigations against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

199.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

200.    As a direct and proximate result of the Individual Defendants' conduct, Biogen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## **DERIVATIVE ALLEGATIONS**

201.    Plaintiff brings this action derivatively and for the benefit of Biogen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Biogen, waste of corporate assets, unjust enrichment, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

202.    Biogen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

203.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Biogen. Plaintiff will adequately and fairly represent the interests of Biogen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

204.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

205.     A pre-suit demand on the Board of Biogen is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Dorsa, Freire, Hawkins, Mantas, Rowinsky, Sherwin, and Viehbacher (the "Director-Defendants"), and non-parties Susan Langer and Monish Patolawala (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was commenced.

206.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

207.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing,

the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

208.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols, especially regarding revenue projections, accounting procedures, and financial reporting, are an integral part of the Company's business. As an entity operating in a federally regulated industry, maintaining adequate risk management and compliance procedures lie at the core operations of Biogen. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

209.    Additional reasons that demand on Defendant Viehbacher is futile follow. Defendant Viehbacher serves as the Company's President and CEO and has served as a director since November 2022. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Viehbacher with his principal occupation, and he receives handsome compensation, including $4,069,913 during the 2023 Fiscal Year and $30,488,593 during the 2022 Fiscal Year. As the Company provides Defendant Viehbacher with his primary occupation and means of livelihood, he is unable to consider a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Biogen. Defendant Viehbacher was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, he solicited the 2023 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if

any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Viehbacher is a defendant in the Securities Class Action. For these reasons, too, Defendant Viehbacher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Dorsa is futile follow. Defendant Dorsa has served as a Company director since January 2010. She has also served as the Chair of the Board since the 2023 Annual Meeting, serves as the chair of the Corporate Governance Committee, and was determined by the Board to be an audit committee financial expert. The Company provides Defendant Dorsa with handsome compensation, including $646,132 during the 2023 Fiscal Year and $425,246 during the 2022 Fiscal Year. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her, as well as Defendants Denner, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin, to the Board. Further, she solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting her, as well as Defendants Denner, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin, and Viehbacher, to the Board. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Dorsa breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Freire is futile follow. Defendant Freire has served as a Company director since June 2021. Defendant Freire is also a member of the Compensation and Management Development Committee. The Company provides Defendant Freire with handsome compensation, including $412,889 during the 2023 Fiscal Year and $413,789 during the 2022 Fiscal Year. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her, as well as Defendants Denner, Dorsa, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin, to the Board. Further, she solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting her, as well as Defendants Denner, Dorsa, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin, and Viehbacher, to the Board. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Freire breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Hawkins is futile follow. Defendant Hawkins has served as a Company director since June 2019. Defendant Hawkins also serves as the Chair of the Audit Committee and as a member of the Corporate Governance Committee. The Company provides Defendant Hawkins with handsome compensation, including $425,729 during the 2023 Fiscal Year and $413,789 during the 2022 Fiscal Year. In addition, he solicited the 2022

Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin, to the Board. Further, he solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Jones, Mantas, Mulligan, Rowinsky, Sherwin, and Viehbacher, to the Board. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Mantas is futile follow. Defendant Mantas has served as a Company director since June 2019. Defendant Mantas also serves as the Chair of the Compensation and Management Development Committee and as a member of the Audit Committee. The Company provides Defendant Mantas with handsome compensation, including $433,229 during the 2023 Fiscal Year and $417,746 during the 2022 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mulligan, Papadopoulos, Rowinsky, and Sherwin, to the Board. Further, he solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mulligan, Rowinsky, Sherwin, and Viehbacher, to the Board. As a Company

director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mantas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Rowinsky is futile follow. Defendant Rowinsky has served as a Company director since March 2010. Defendant Rowinsky also serves as a member of the Compensation and Management Development Committee and Corporate Governance Committee. The Company provides Defendant Rowinsky with handsome compensation, including $418,023 during the 2023 Fiscal Year and $410,246 during the 2022 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, and Sherwin, to the Board. Further, he solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Sherwin, and Viehbacher, to the Board. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Rowinsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Sherwin is futile follow. Defendant Sherwin has served as a Company director since March 2010. Defendant Sherwin is also a member of the Audit Committee. The Company provides Defendant Sherwin with handsome compensation, including $435,317 during the 2023 Fiscal Year and $410,246 during the 2022 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, and Rowinsky and to the Board. Further, he solicited the 2023 Proxy Statement which contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting him, as well as Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, and Viehbacher to the Board. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sherwin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on the Board is futile follow.

217.    Defendants Hawkins (as Chair), Mantas, and Sherwin (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading

statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

218.    In violation of the Code of Business Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, violations of the Exchange Act, and aiding and abetting thereof.  In violation of the Code of Business Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Business Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

219.    Biogen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Biogen any part of the damages Biogen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

220.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

221.    The acts complained of herein constitute violations of fiduciary duties owed by Biogen's officers and directors, and these acts are incapable of ratification.

222.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Biogen. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Biogen, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

223.    If there is no directors' and officers' liability insurance, then the Directors will not cause Biogen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

224.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

227.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

228.    Defendants Dorsa, Freire, Hawinks, Mantas, Rowinsky, Stephen, and Sherwin caused the 2022 Proxy Statement and the 2023 Proxy Statement, and Defendant Viehbacher caused only the 2023 Proxy Statement, to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls

and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls.

229.    The 2022 Proxy Statement and 2023 Proxy Statement were false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by six of the Individual Defendants.

230.    The false and misleading elements of the 2022 Proxy Statement led to the re-election of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos, thereby allowing them to continue breaching their fiduciary duties to Biogen.

231.    The false and misleading elements of the 2023 Proxy Statement led to the election of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin, and Viehbacher thereby allowing them to continue breaching their fiduciary duties to Biogen.

232.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement and 2023 Proxy Statement.

233.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

234.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Biogen's business and affairs.

236.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

237.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Biogen.

238.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

239.    In further breach of their fiduciary duties owed to Biogen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company exaggerated the measures taken to increase transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of the controls and procedures; (2) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (3) the Company's overstated efforts, failure to maintain adequate internal controls, and its illegal

or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action, in addition to substantial legal, financial, and reputational harm; (4) Biogen claimed the Company's and Eisai's launch of Leqembi, in addition to other efforts, bolstered its AD-related product portfolio; (5) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 Fiscal Year non-GAAP diluted EPS; (6) Biogen overlooked the potential negative impact of the foregoing on Biogen's 2023 financial results; and (7) in breach of their fiduciary duties, the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls.

240.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

241.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

242.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

243.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

244.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Biogen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

245.    Plaintiff on behalf of Biogen has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

246.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

247.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Biogen, for which they are legally responsible.

248.    As a direct and proximate result of the Individual Defendants' abuse of control, Biogen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Biogen.

252.    The Individual Defendants either benefitted financially from the improper conduct or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

253.    Plaintiff, as a shareholder and a representative of Biogen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

254.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Biogen in a manner consistent with the operations of a publicly held corporation.

257.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Biogen has sustained and will continue to sustain significant damages.

258.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

259.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

260.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

262.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

263.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Viehbacher, Vounatsos, and McDonnell for Contribution Under Sections 10(b) and 21D of the Exchange Act

264.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.    Biogen, along with Defendants Viehbacher, Vounatsos, and McDonnell, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated

thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Viehbacher, Vounatsos, and McDonnell's willful and/or reckless violations of their obligations as officers and/or director of Biogen.

266.    Defendants Viehbacher, Vounatsos, and McDonnell's, because of their positions of control and authority as officers and/or director of Biogen, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Biogen, including the wrongful acts complained of herein and in the Securities Class Action.

267.    Accordingly, Defendants Viehbacher, Vounatsos, and McDonnell are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

268.    As such, Biogen is entitled to receive all appropriate contribution or indemnification from Defendants Viehbacher, Vounatsos, and McDonnell.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Biogen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Biogen;

(c)    Determining and awarding to Biogen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Biogen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Biogen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Biogen to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Biogen restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 24, 2024                        Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

DocuSign Envelope ID: 82AA32D3-7968-4A81-ACBB-0AB76079C3D2

## VERIFICATION

I, Jonathan Blaufarb, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19th day of June, 2024.

DocuSigned by:

*Jonathan Blaufarb*

038365E245DC4F8...

Jonathan Blaufarb